PT KALTIM PRIMA COAL, Plaintiff,

v.

AES BARBERS POINT,
INC., Defendant.

No. 00 Civ. 7196 AKH.

United States District Court,
S.D. New York.

Dec. 18, 2001.

---

Cary Samowitz, Lord, Bissell & Brook, New York City, for plaintiff.

Kelli C. McTaggart, Joe Robert Caldwell, Jr., Miller, Cassidy, Larroca & Lewin, Washington, DC, Richard H. Dolan, Schlam Stone & Dolan, New York City, for defendant.

## OPINION AND ORDER

HELLERSTEIN, District Judge.

This case arises from a twenty-year requirements contract for coal, in effect since January 1990. The plaintiff-supplier, PT Kaltim Prima Coal ("KPC"), claims that the defendant-purchaser breached the contract by refusing to accept delivery of September and October 2000 shipments. The defendant-purchaser, AES Barbers Point, Inc. ("AES"), claims that its refusal was excused by the supplier's invocation of the force majeure clause of the contract, and its need to obtain replacement supplies promptly. After full discovery, both sides moved for summary judgment and, having presented all available evidence and in response to my request, converted their motions to motions for judgment after trial, without a jury, pursuant to Fed.R.Civ.P. 52.[1]

For the reasons discussed below, I find that AES acted reasonably and pursuant to the contract in refusing to accept delivery of the September 2000 shipment, and that it breached the contract in refusing to accept delivery of the October 2000 shipment. Accordingly, I grant judgment to AES as to the September 2000 shipment, and to KPC as to the October 2000 shipment.

### Factual Background

KPC owns and operates a coal mining facility in East Kalimantan, Indonesia. AES operates a coal-fired cogeneration facility at Barbers Point in Oahu, Hawaii, producing electricity for sale to its primary customer, Hawaiian Electric Company. The electricity produced by AES supplies 20 per cent of the electricity requirements of the island of Oahu.

Pursuant to an Amended and Restated Fuel Supply Agreement executed January 12, 1990 (the "Fuel Supply Agreement" or the "Agreement"), KPC is the sole supplier of coal to AES for a twenty-year period.[2] The coal supplied is to be priced according to a formula set out in the Agreement. At the time the contract was made, the formula price was approximately 10 per cent below market. At the time of the events leading to this dispute, however, the formula price was approximately double the market price.

---

[1] Only count one of the complaint remains. Count two of the complaint, which stated a claim for specific performance, was dismissed as moot because of continued performance after the October 2000 shipment. Count three of the complaint, which stated a claim for tortious interference with contractual relations, was dismissed as duplicative of count one and legally insufficient.

[2] KPC's deliveries were intended to replenish AES's active coal pile, which is drawn down to the point of minimal tonnage over the course of each month. Pursuant to a separate agreement with Hawaiian Electric Company, AES also maintains an "emergency" reserve coal pile at Barbers Point sufficient to cover approximately 25 to 45 days of anticipated need, depending on plant utilization.

The Fuel Supply Agreement contemplates monthly deliveries of coal from KPC in Indonesia to the AES facility in Hawaii. According to the custom of the parties, AES provides a proposed shipping schedule to KPC once a year, and updates the schedule regularly based on AES' needs. Also according to the parties' custom, KPC nominates a ship to AES during the final week of the month preceding shipment, to set sail for AES in the first week of the shipment month and arrive to 15 to 20 days later.

Over the course of approximately ten years, KPC delivered, and AES received, 88 shipments of coal, totaling 4.6 million tons, without incident. Using telefax and electronic mail, officials of KPC and AES maintained frequent and continuous communications concerning AES' requirements and KPC's fulfillments.

Beginning in mid-June 2000, labor strife at KPC's Indonesian facilities interfered with KPC's ability to process and move coal to its loading port. On July 4, 2000, KPC declared force majeure on all of its sales contracts, including its agreement with AES, effective "4 July, 2000 until full operations recommence." KPC did not express an anticipated "recommence[ment]" date:

> We regret to formally advise that since June 14, 2000 PT Kaltim Prima Coal's (KPC) coal processing facility has been illegally blockaded by some employees who are members of SBSI (Serikat Buruh Sejahtera Indonesia), one of the three labour associations at KPC. As a result of that actions [sic], KPC has been unable to crush coal or convey coal to the Tanjung Bara Coal Terminal (TBCT). Shipments of coal from June 16, 2000 to today have fully depleted the coal stocks at TBCT.
>
> This illegal action prevents KPC from fulfilling certain of its contractual obligations and accordingly PT. Kaltim Prima Coal declares the above action to be an event of Force Majeure. Force Majeure is therefore in effect from 4 July, 2000 until full operations recommence.

Despite its declaration of force majeure, KPC's July shipment to AES, having already been loaded without incident, was delivered on time. On July 9, 2000, KPC lifted its declaration of force majeure.

KPC's labor problems continued. In mid-July 2000, the striking labor union again blockaded KPC's coal processing facility and conveyer. On July 21, 2000, AES' President and General Manager, Kevin Pierce, having learned that obtaining coal from an alternate supplier would require 40 to 50 days lead time, sought assurance from KPC that it would continue to supply coal to AES as required. On July 24, 2000, KPC responded by giving assurance that it would have sufficient coal for the August shipment, and that it had been developing other supply options should the need have arisen:

> During this time your coal requirements have definitely been at the forefront in our considerations to ensure you had sufficient coal. We had progressed [sic] a couple of options available to us where KPC could, with your prior approval, deliver coal from other sources within the specification limits. Fortunately however, this is no longer necessary as KPC has returned to full operations.... We are currently working with [the shipping agent] to find the appropriate vessel within the 3 August to 13 August laycan loading window and can assure you that there will be coal available for your next shipment.

On August 2, 2000, KPC advised AES that KPC had enough coal at the port ready to be loaded and shipped for the August 2000 requirement. The next day, however, on August 3, 2000, KPC issued a

"Notice of Potential Force Majeure," stating that its coal conveyor had again been disrupted by labor strife and that "[i]t remains unclear as to how long this action will continue." On August 5, 2000, KPC issued yet another "Notice of Potential Force Majeure," stating that, "[w]ithout action by the government authorities the removal of the blockade is unlikely within the foreseeable future."

Notwithstanding its Notice of Potential Force Majeure, and at the same date of August 5, 2000, KPC loaded the vessel it had nominated for the August delivery to AES, thereby exhausting the coal already at the port. The ship set sail August 8 and arrived at Barbers Point on August 27, 2000.

On August 7, 2000, KPC declared Force Majeure on all of its sales contracts, effective midnight that day. KPC's notice to its customers stated:

> The operations at KPC minesite remain blockaded with no being [sic] coal conveyed to the port since Wednesday, 2nd August. KPC no longer has sufficient coal available to fully load any awaiting ship.
> Effective 24.00, 7th August, 2000, KPC declares Force Majeure under its sales contracts.

KPC's "Notice of Force Majeure" made no mention of the expected duration of the force majeure event. According to KPC's August 5 potential force majeure notice, the condition was expected to last for "the foreseeable future," until government authorities caused the blockade to be removed.

Later the same day of August 7, 2000, KPC advised its customers that it could supply their needs from alternative sources and provided specifications for two of these sources. Its communication to AES stated:

> As you are aware, KPC were [sic] forced again to declare Force Majeure under our sales contracts due to the continuing blockade at the mine site.... We are obviously trying to ensure AES Barbers Point is not adversely affected by what is happening at KPC so we are widening our contingency plans well in advance. If KPC is unable to provide coal from our mine, we would like to assist you through our relationships with other Rio Tinto coal companies in Australia to provide market priced coal.[3] These companies have already indicated willingness to assist us in sourcing alternative coal for our customers.
>
> I attach two specifications of coal potentially available and ask you to comment whether these coals would be suitable at least [sic] the short term if KPC remains out of action.

AES did not respond. At the time, it was pursuing alternative sources of coal supplies on its own.

On August 10, AES advised KPC that it had made alternative arrangements for both its September and October 2000 coal requirements. AES entered into written contracts with Glencore AG on August 15, 2000 for the September 2000 shipment and with Enron Corporation on August 17, 2000 for the October 2000 shipment.

KPC responded by e-mail on August 10, the same day that AES had notified KPC of its alternate arrangements. KPC advised AES that it expected that the condi-

---

3. KPC is affiliated with Rio Tinto in the following way: one of the two 50 per cent owners of KPC is a wholly owned subsidiary of the Rio Tinto Group. The Rio Tinto Group is comprised of Rio Tinto plc and Rio Tinto Limited, dual listed companies managed on a unified basis. Rio Tinto shares are listed on the London, Australian and New Zealand stock exchanges. The companies also have an ADR facility with the Bank of New York.

tion of force majeure to last no longer than August 19, and that KPC therefore should be able to meet its contractual requirements for September. KPC's General Manager of Marketing (and the person who regularly communicated with AES), Ross Tromans, wrote:

> It is my view that the Force Majeure is not expected to last longer than the 19th August given the reaction by the work force who are not on strike and the reaction of the local community. I believe that the protestors will be pressured to return to work and KPC will be producing coal in order to meet the next shipment requirement from AES. If this occurs, AES' September shipment will be met by KPC.

Following this August 10 e-mail, KPC nominated a vessel on August 23, 2000, for timely delivery of the September shipment to AES and, on August 24, 2000, lifted its declaration of force majeure. On August 24, 2000, AES advised KPC that it refused to accept delivery of the September shipment. On September 20, 2000, KPC nominated a vessel for timely delivery of the October shipment to AES. The following day, AES advised KPC that it refused to accept delivery of the October shipment. KPC then filed this lawsuit.

### Relevant Contractual Provisions

Article III of the Fuel Supply Agreement sets forth the basic substance of the contract. Section 3.2(a) provides that "Seller shall sell and deliver to Buyer and Buyer shall purchase from and pay Seller for ... 100 percent of Buyer's coal requirements." Section 3.2(b) provides that if KPC fails to deliver coal for any reason (other than the fault of AES), AES has the right to obtain coal from another source "as and to the extent reasonably necessary to enable [AES] to operate ... for so long as such failure to deliver Coal continues." Section 3.7(c) provides that KPC "shall use its best efforts to assist [AES] in finding and acquiring such replacement supplies." Section 3.7(b)(i) provides that if KPC fails to deliver any shipment—other than through the fault of AES or due to an event of force majeure—AES may request KPC to provide "assurances to [AES'] reasonable satisfaction" that future shipments will be made. If KPC fails to give such assurances, Section 3.7(b)(i) gives AES the right to direct KPC to suspend shipments until KPC provides the required assurances.

The Fuel Supply Agreement recognizes that the coal to be supplied to AES must be of exact specifications. Section 3.4 thus provides that the coal must come from a particular KPC mine in Indonesia "unless [AES] has given its prior written consent, which consent shall not be unreasonably withheld."

Section 3.2(a) provides that shipments are to be spaced in even intervals throughout each year, while Article IV contains more specific shipping provisions. Section 4.2(a) requires the parties to agree each October to a "Provisional Shipping Program" for the year following, the Program to conform to a detailed noticing sequence. First, each month, a 31–day period is to be identified for loading and shipping; second, KPC is to give AES 25 days' notice of a 15–day period, within the 31 days, when loading is to begin; third, KPC is to give AES 10 days' notice of a five-day period, within the 15 days, when loading is to begin; fourth, KPC is to give AES notice when loading has been completed and the ship has set sail, and various details about the shipment; and, fifth, KPC is to give AES a sequence of notices of the ship's expected arrival at Barbers Point 14 days, seven days, 48 hours, 24 hours, and 12 hours in advance.

Article IV also provided for slippages in the shipping Program. If KPC is unable

to begin loading within the five-day period mentioned above, KPC is to give AES notice to that effect within the next five days, and assurance that loading will actually commence within 15 days after the five-day period. Section 4.2(c)(iii) of the Agreement provides that a breach by KPC of these grace periods for giving notice and effecting cure constitutes a failure to make delivery under the Fuel Supply Agreement, authorizing AES to seek supplies from alternative sources. Notwithstanding these grace periods, should KPC fail to commence loading within the original 5–day window, AES has the right to obtain coal elsewhere; provided, however, that if KPC succeeds in loading coal within the grace period, AES is obligated to accept the shipment.

Article VII of the Fuel Supply Agreement defines force majeure and provides the rights and responsibilities of the parties following a force majeure event. An event qualifying for force majeure is defined in Section 7.1 as "any act or event which wholly or partially prevents or delays the performance of obligations arising under this Agreement if such act or event is not reasonably within the control of and not caused by the fault or negligence of the nonperforming Party." If the parties disagree as to whether force majeure was declared validly, Section 7.2 provides that the issue is to be submitted to arbitration. Section 7.3 deals with the effect of force majeure and provides that "[i]f either party is rendered wholly or partially unable to perform its obligations ... because of a Force Majeure event that Party shall be excused from whatever performance is affected" only under certain conditions. Specifically, the declaring party must:

(a) ... [W]ithin five Business days after the occurrence of the [event] provide written notice to the other Party of the particulars of the occurrence, including an estimation of its expected duration and probable impact on the performance of its obligations ..., and continue[ ] to furnish timely regular reports with respect thereto ...;

(b) ... [U]se all reasonable efforts to continue to perform its obligation ... and to correct or cure the event or condition excusing performance and, where applicable, ... allocate all of its then available rights to coal supplies and reserves on a pro rata basis (as is reasonably practicable) among only [AES] and those other customers with whom [KPC] at such time has firm contracts ...;

...

(f) ... [E]xercise all reasonable efforts to mitigate or limit damages to the other Party; ...

Additionally, Section 7.3 mandates that "[t]he suspension of performance shall be of no greater scope and no longer duration than is reasonably necessitated by the Force Majeure event."

Under Section 15.5, the governing law of the Fuel Supply Agreement is that of New York.

**Discussion**

I. *Breach of Contract*

 The issue that this court is asked to decide is whether, under the Fuel Supply Agreement, interpreted according to New York law, AES' refusal to accept KPC's shipments for the months of September and October 2000 constituted breaches of that Agreement. AES argues that KPC's declaration of force majeure on August 7, 2000 relieved both parties from their duties of performance, and that AES acted reasonably and appropriately in making alternative arrangements to assure unbroken supply; hence, AES argues, it was excused from having to accept KPC's

tenders of September and October deliveries.[4] KPC argues that its declaration of force majeure on August 7, 2000 was not sufficient in itself to relieve either party's performance obligations. KPC argues that under Section 7.3 of the Fuel Supply Agreement, it had five days after the event of force majeure to provide the "particulars of the occurrence" and to estimate "expected duration and probable impact," and that these conditions subsequent did not occur before KPC became ready, willing and able to ship in time for AES' September and October requirements. Therefore, KPC argues, AES' acted prematurely in refusing KPC's tender of September and October deliveries, and thus breached the Fuel Supply Agreement.

▪ KPC's declaration of force majeure on August 7 did not affect KPC's August obligation to ship coal, since KPC already had nominated and loaded a vessel, and the loaded vessel was set to sail on time. As to KPC's obligation to supply coal to AES for its required end-of-September delivery, KPC had at least until August 21—and most likely later—to nominate a ship and had until about September 4 to load that ship. KPC's August 7 declaration, therefore, appears to have been premature: no performance on KPC's part was disabled, or in light of KPC's estimate of the probable length of the strike, reasonably was expected to be disabled.[5] Furthermore, if the strike were to continue, KPC had the right under Section 3.4 of the Agreement to nominate an alternative source to supply AES' coal requirements and, given the shipping schedule outlined above, KPC appears to have had the time to tender shipment from such an alternative source for AES' review and acceptance.[6] Indeed, KPC's second communica-

4. AES argues, alternatively, that KPC's Notice was an anticipatory repudiation of its contract obligations. Since, however, KPC was ready, willing, and able to perform timely and completely, as to both the September and October shipments, and its notice of August 7, 2000 was a notice contemplated by the Fuel Supply Agreement, KPC did not breach its contract obligations. *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F.Supp. 312, 317 and n. 5 (S.D.N.Y.1989) (anticipatory repudiation occurs only where there is a clear manifestation of intent not to perform when time for performance arrives). The issue is not whether KPC breached but, rather, whether AES was excused from having to receive and pay for either, or both, the September and October shipments.

AES also argues, in a footnote, that KPC's declaration of force majeure was invalid. AES reasons that since the Fuel Supply Agreement defines force majeure generally and does not provide that labor strife should be considered an event of force majeure, and since labor strikes are foreseeable and resolvable, they should not qualify as an event of force majeure.

Whether, in the absence of a pertinent clause, labor strikes should be construed as included or excluded from a non-specific force majeure clause is not entirely clear. *See, e.g., Farnsworth on Contracts* § 9.9a, at 647 n. 10 (In drafting a force majeure clause, "[t]he drafter may want to make it clear that settlement of strikes of a party's employees is to be within the discretion of that party.... It is equally important to exclude strikes as excusing events if that is intended.").

Here, however, it is reasonable to conclude from the broad language of the force majeure provision that the parties intended to include labor strikes as force majeure events, and I so find. AES did not object to KPC's first notices of labor strife and potential force majeure, suggesting that both parties considered that labor strife was embraced by the general language of the force majeure clause. AES' footnote argument is an after-thought and without merit.

5. KPC's letter of August 10, 2000, sent three days after it declared Force Majeure, estimated that pressures by non-striking workers and the local community should cause the strike to end by August 19.

6. AES had the right to review the specifications of the coal, but could not withhold consent unreasonably. Fuel Supply Agreement, § 3.4. Since AES itself had made arrange-

tion of August 7 suggested that it could supply coal to AES from an alternate source, namely, Australian mines controlled by one of KPC's two owners.

KPC's Notice of Force Majeure of August 7, however, was a general notice to all KPC's customers, advising them of KPC's complete inability to continue its coal-processing and ship-loading operations, without any estimate when the condition of disablement was expected to end, or whether any alternative sources would be offered. Nothing KPC did in the immediate wake of its declaration negated or withdrew that declaration. KPC's follow-up notice of the same day, advising AES that KPC was "widening [its] contingency plans well in advance" and offering to provide coal from other mines "[i]f KPC is unable to provide coal from [its own] mine," did not negate KPC's force majeure declaration. This second August 7 communication was simply an advice to AES consistent with KPC's obligation under the force majeure clause to "use all reasonable efforts to continue to perform its obligations." Fuel Supply Agreement, § 7.3(b). Moreover, this second August 7 advice was not made as a tender of delivery from alternative permissible sources, as KPC could have offered pursuant to Section 3.4 of the Fuel Supply Agreement.

Nor did KPC's communication of August 10, advising AES that it expected the strike to end by August 19, withdraw or terminate the Notice of Force Majeure that KPC had declared three days earlier. Rather, the advice, responding to AES' notice that it had secured alternate shipments, appears to have been communicated in order to keep AES updated on the force majeure event, consistent with KPC's obligation under Section 7.2(a) of the Fuel Supply Agreement.

A declaration of force majeure relieves both seller and buyer of their contractual obligations. See E. Allan Farnsworth, *Farnsworth on Contracts* § 9.9a, at 650 (2d ed.1998) ("the traditional force majeure clause ... has the effect of relieving both parties from their duties of further performances"). Parties may agree, however, that a force majeure event will have a different result, such as broadening or narrowing excuses of performance and attaching conditions to the exercise and effects of a force majeure clause. *Farnsworth on Contracts* § 9.9a, at 650. The Fuel Supply Agreement attaches such conditions, providing, for example, in Section 7.3, that the declarant is required to notify affected parties within five business days of the probable impact of the event of force majeure, and to take steps to minimize the effects of force majeure on the other party. However, the Fuel Supply Agreement imposes no conditions limiting or enlarging the rights and obligations of the party receiving the declaration of force majeure. Thus, KPC, the declaring party, had the obligation under Section 7.3 to provide the updating notice and to take the steps mentioned above. But Section 7.3 imposed no correlative limitations on the rights of AES, the non-declaring party.

For example, AES was not required to seek assurances before it committed to an alternate supplier. Under the New York Uniform Commercial Code, a buyer may seek "adequate assurance of performance" if "reasonable grounds for insecurity arise" with respect to the seller's ability to perform. N.Y. U.C.C. § 2–609. AES was entitled to understand that the August 7 Notice of Force Majeure evidenced an inability to perform on KPC's part. *See* N.Y. U.C.C. § 2–616 (seller's declaration of

ments for an alternative source of shipment, it could not argue that coal only from KPC's

particular Indonesian mine would be acceptable.

force majeure gives buyer right to terminate by notice its reciprocal obligation to take and pay for seller's performance; buyer is not required first to seek assurance from seller that seller will, or will not, be able to perform).

The same conditions and interpretations apply under the agreement between the parties. Pursuant to the Fuel Supply Agreement, if KPC failed in one month's performance, AES could demand assurance from KPC regarding future performance. Fuel Supply Agreement, § 3.7(b)(i). But AES did not have to demand assurance if KPC were to declare force majeure; notice alone sufficed to terminate AES' obligation to take and pay for that month's coal requirements. *Id.*

The duty of good faith and fair dealing does not change the analysis. A duty of good faith and fair dealing inheres in every contract, and affects how the terms and conditions of the contract, and the rights and obligations of the parties, are to be understood. *See, e.g.,* N.Y. U.C.C. § 1–203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement"); *Dalton v. Educational Testing Service,* 639 N.Y.S.2d 977, 979, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995) (necessarily included promises may be read into a contract). But "[t]he duty of good faith and fair dealing ... is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Id.,* 639 N.Y.S.2d at 979–80, 87 N.Y.2d at 389, 663 N.E.2d at 291–292 (refusing to place affirmative obligations on defendant testing service where contract placed duty on plaintiff test-taker). While the duty of good faith prevents a party from engaging in conduct that will deprive the other of the benefits of their agreement, *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980), "the duty cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract"; it "'cannot add to, detract from, or alter the terms of the contract itself.'" *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 17 F.Supp.2d 275, 306 (S.D.N.Y.1998); *see also CIBC Bank and Trust Co., Ltd. (Cayman) v. Banco Cent. do Brasil,* 886 F.Supp. 1105, 1118 (S.D.N.Y.1995).

Under the Fuel Supply Agreement, if KPC failed to make delivery, AES had the right to buy coal from another source "as and to the extent necessary." Fuel Supply Agreement, § 3.2(b). The provision of Section 4.2(c)(iii), enabling AES immediately to get supplies elsewhere if KPC departs from the shipping program, and the sequence of notices KPC was required to give AES under the sequences provided by Article IV—e.g., of the dates KPC intended to load, of the ship's departure from Indonesia and its progress in reaching Barbers Point—as well as other provisions of the Fuel Supply Agreement, enhanced AES' right to obtain cover if KPC became unable to supply any month's coal requirements. Plainly, the purpose of these various provisions was to assure AES of unbroken and reliable coal deliveries to supply the Barbers Point power generation facility and the citizens and residents of Hawaii.

Under these considerations of law and contract, AES had the right to understand KPC's declaration of force majeure on August 7 as a notice by KPC that conditions existed sufficient to excuse KPC from its obligation to make the next forthcoming delivery. Nothing in the law or the contract required AES to wait for a performance that it reasonably believed would arrive too late for its September requirements. *See, e.g.,* N.Y. U.C.C. § 2–616(3) and cmt. ("Subsection (3) [of § 2–616] denies effect to any contract clause ...

which would require the buyer to stand ready to take delivery whenever the seller is excused from delivery by unforeseen circumstances."). AES did not have to wait until a missed shipment might jeopardize its ability to generate power for the residents of Oahu. AES did not have to assume the risk that a tightening market, caused by the scrambling of KPC's numerous coal customers to locate alternate sources, might lock out AES altogether if it did not cover quickly for the near term. *See, e.g.,* Restatement (Second) of Contracts § 242(b) ("the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements" is a factor relevant to discharge).

■ AES was not entitled, however, to proceed as if the event of force majeure would never cease. The Fuel Supply Agreement provided for monthly nominations and loading of ships and monthly deliveries to Barbers Point. The one previous declaration of force majeure by KPC had a short duration, of but a few days, and there was nothing in the circumstances to cause AES reasonably to believe that the August 7 condition would be materially different, or would be likely to jeopardize any but the next month's (i.e., September's) requirements. Although AES was justified in believing that delivery would not be made timely for September, it was not justified in assuming, without further inquiry, that KPC's notice of August 7 would affect shipments beyond September 2000.

KPC's declaration of force majeure on August 7 preceded by at least two weeks KPC's next obligation under the Fuel Supply Agreement, namely, to nominate a ship for the September delivery, and four weeks or more before that ship had to be loaded and set sail for Barbers Point to make delivery to AES by September 24, 2000. In light of the 40 to 50 days of lead time that AES learned would be required to obtain alternative supplies, AES reasonably believed that it had to act immediately to secure an alternate source or sources.

AES' belief, although reasonable with respect to the September coal delivery, was not reasonable with respect to the shipment due for delivery in Barbers Point the last week in October. Counting from August 7, the date KPC gave notice of force majeure, there were more than 75 days before AES could expect the October delivery of coal from KPC. AES presented no evidence that it could not have effected cover within that time frame. In light of KPC's notice of August 7 that supplies were available in Australia, and its notice of August 10 that the condition of force majeure was likely to end before the end of the month, AES could have obtained reasonable assurance of timely delivery well before it had to commit to an alternative source. AES' cover for October was therefore hasty, unreasonable in the circumstances, and insufficient to excuse its contract obligations to KPC with respect to the October 2000 shipment.

Accordingly, as applied to the facts before me, I find that KPC's declaration of August 7 gave AES the right to consider its own performance obligation under the contract excused for the September delivery, but not for the October delivery. Thus, AES acted properly in giving notice to KPC that it had made alternative arrangements and would not take and pay for the September delivery of coal. It acted improperly with respect to the delivery due the end of October.

## II. *Damages*

■ AES, having breached the Fuel Supply Agreement with respect to the October 2000 shipment, is liable to KPC for damages caused by that breach. Damages

here consist of five components: (1) the formula price for AES' October requirements provided by the Fuel Supply Agreement, less the market price of that quantity and quality of coal, at or around the time and place of breach; (2) net of commissions paid by KPC to its broker, Sprague Energy Corporation; (3) net of fees paid by KPC to Cobelfret, N.V., KPC's shipping agent; (4) plus an "availability bonus"; [7] and (5) plus interest to the date of judgment.

If KPC had made the October shipment of coal to AES, AES would have paid it $3,617,715.91. KPC would have had to pay $675,379.25 in freight charges to Cobelfret and $61,077.22 to Sprague Energy as commission. KPC's net would have been $2,881,259.44.

KPC was able to sell this volume (55,133MT) and quality of coal on the open market for $1,490,374.75 (using the weighted average price at which KPC sold the 110,406MT destined for AES for both September and October deliveries).[8] KPC thus is entitled to $1,390,884.69, as the difference between what AES would have paid KPC for the October shipment, less certain costs KPC would have incurred, and the price at which KPC actually sold the shipment. By agreement of the parties, KPC is also entitled to the availability bonus for the October shipment in the amount of $50,000.[9]

However, KPC is not entitled to an allowance for either the unpaid commission to Sprague Energy or the unpaid fees to Cobelfret. Pursuant to its Letter Agreement with Sprague Energy, KPC is obliged to pay a commission "for coal supplied to AES pursuant to the [Fuel Supply] Agreement." For neither September nor October 2000 was coal supplied to AES pursuant to the Fuel Supply Agreement, and it is not at all clear that KPC is obligated to pay commissions to Sprague Energy for these putative shipments. The same is true regarding Cobelfret, for KPC does not appear to have been obligated under its Contract of Affreightment with Cobelfret to nominate vessels and pay fees if coal was not being shipped to AES.[10] Although AES notified KPC that it would not require an October shipment, and although AES already had rejected the proposed September shipment, KPC decided not to alter its shipping schedule with Cobelfret. KPC failed to mitigate its own damages, and cannot now demand payment from AES for this failure. *See Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985) ("New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages."); *Lucente v. International Business Machines Corp.*, 117 F.Supp.2d 336, 357 n. 12 (S.D.N.Y.2000) ("The general rule of

---

7. Section 5.2 provides that KPC is entitled to additional compensation if AES' "availability payment" from Hawaiian Electric Company meets or surpasses a certain factor upon which that availability payment is based. This "availability bonus" under the Fuel Supply Agreement is to be calculated following the end of each contract year.

8. AES did not dispute using KPC's selling price as the equivalent of market price for the indicated quantity and quality of coal at the time and place of breach.

9. Section 5.1(b)(i) of the Fuel Supply Agreement, the contractual provision for the "availability bonus," presents a complicated formula. The parties did not brief the calculation, but AES does not dispute either the amount or the category of damage.

10. Section 2.1 of the Contract of Affreightment states the scope as follows: "This Contract is a requirement Contract in terms of which KPC hereby agrees to ship all its Coal supply destined for AES, and Cobelfret agrees to transport, in vessels provided by Cobelfret, such coal...."

law in a breach of contract case is that the plaintiff should not be compensated for any loss he or she could have avoided upon learning that defendant had breached.").

KPC is entitled to pre-judgment interest on its $1,440,884.69 in damages under New York Civil Practice Law and Rules ("CPLR") § 5001, at the rate of 9% per annum, calculated from October 1, 2000.[11]

The Clerk shall enter judgment accordingly.

SO ORDERED.

---

**11.** Interest is available from the time of breach. *Barry v. Atkinson*, 1999 WL 605422, *9 (S.D.N.Y. Aug. 10, 1999). CPLR § 5001(b) states that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed." Although AES notified KPC on August 10, 2000 that it would not need an October shipment, its formal rejection of the October shipment did not issue until the end of September, when it refused KPC's nomination of the October vessel. I fix October 1, 2000 as the appropriate date from which pre-judgment interest should accrue. *See* CPLR § 5001(b).