MEMORANDUM OPINION AND ORDER
 

 FRANCIS, United States Magistrate Judge.
 

 The plaintiffs in this class action are some 29,700 claimants who were employed on cruise ships operated by Royal Caribbean Cruise, Ltd. (“Royal Caribbean”) and its affiliates, including Celebrity Cruise Lines (“Celebrity”). The plaintiffs alleged that they were denied overtime pay to which they were entitled under collective bargaining agreements entered into between the companies and two international labor unions. During the course of litigation, the parties entered into negotiations that ultimately led to a settlement agreement that was approved by the Court. As will be described in detail below, the agreement established a procedure by which class members would file claims in order to receive payment in specified amounts out of funds provided by the defendants. Counsel for the plaintiff class now seek an order requiring payment of claims that either were filed after the deadline set forth in the settlement agreement or were not signed by the claimant. This motion presents important issues concerning the role of a court in implementing the settlement- of a class action.
 

 Background
 

 On October 22, 2002, the parties entered into the Settlement Agreement designed to conclude this litigation. (PI. Exh. 2 (the “Settlement Agreement”)).
 
 [1]
 
 On November 5, 2002, the Honorable Kimba M. Wood, U.S.D.J., issued an order preliminarily approving the settlement. (PI. Exh. 1 (the “Preliminary Approval Order”)). In that order, she certified a settlement class consisting of workers employed in the bar, restaurant, galley, and housekeeping departments of the defendants’ vessels. For persons employed on Royal Caribbean cruise ships, the class period ran from December 1,1996 to August 31, 2002. For workers on vessels operated by Celebrity, which had been acquired by Royal Caribbean, the class period was September 1, 1999 to August 31, 2002. (Preliminary Approval Order, ¶ 2; PL Exh. 3, Affirmation of Paul T. Hofmann dated Dee. 5, 2003 (“Hofmann Aff.”), ¶ 3). Pursuant to the Preliminary Approval Order, notice of the proposed settlement was sent to all class members on November 25, 2002, together with Proof of Claim and Release forms that claimants were required to complete and return in order to receive payment under the settlement. (Preliminary Approval Order ¶ 8; Hofmann Aff., ¶ 4; Notice of Pendency and Proposed Settlement of Class Action, attached to Settlement Agreement). On February 28, 2003, following a settlement hearing, Judge Wood issued a Final Order and Judgment Approving Class Action Settlement and Dismissing Claims. (PL Exh. 11 (the “Final Order”)).
 

 Pursuant to the terms of the Settlement Agreement, the defendants created a set
 
 *CDLXXXV
 
 tlement fund of $18.4 million. This was the maximum amount that the defendants agreed to pay to satisfy all of their obligations arising out of the litigation. (Settlement Agreement, ¶ 1.22). From this fund, Judge Wood approved an award to class counsel of .attorneys’ fees of $6,133,333.00 and expenses of $144,210.18. (Final Order, ¶ 13). She also authorized an incentive award of $3,000.00 to the named plaintiff, Caesar Dahingo. (Final Order, ¶ 14). After deduction of these amounts as well as expenses incurred in administering the class claims, the residual was designated the Net Settlement Fund from which the unnamed class members were to be paid. (Settlement Agreement ¶ 2.05).
 

 The class members were entitled to a payment based on a formula that took into account when and on which vessels they had worked, the length of their employment, and whether they held positions in which they received tips. Employees who worked on Royal Caribbean vessels from December 1, 1996 to December 31, 1999, or on Celebrity vessels from September 1, 1999 to December 31, 1999 would be entitled to $40 per month worked in tipping positions or $50 per month in non-tipping positions. Persons employed on either line from January 1, 2000 to August 31, 2002 would receive $15 per month in tipping jobs or $20 per month in non-tipping jobs. Awards were to be pro-rated whenever the employee worked part of a month. (Settlement Agreement, ¶ 2.08(a), (b)).
 

 To the extent that the total of the claims exceeded the Net Settlement Fund, the amounts paid to class members would be reduced proportionally. (Settlement Agreement, ¶ 2.05(a)). On the other hand, if the Net Settlement Fund were larger than necessary to pay the claims, any excess would revert to the defendants. (Settlement Agreement, ¶ 2.05(a)).
 

 The firm of Gilardi
 
 &
 
 Co., LLC (“Gilar-di” or the “Claims Administrator”) was retained by Royal Caribbean’s counsel to act as Claims Administrator pursuant to the Settlement Agreement. (Preliminary Approval Order, ¶ 7; Settlement Agreement, ¶ 1.01). The claims procedure provided that “[t]he Proof of Claim and Release shall be submitted such that the Claims Administrator shall receive it within 120 days of the date on which the Class Notice is mailed to the Settlement Class.” (Settlement Agreement, ¶ 2.06(a)). Based on the date that class notice was sent out, the bar date was March 27, 2003. (Proof of Claim and Release (“Proof of Claim”), PI. Exh. 10). The Settlement Agreement stated that “[a]ny Class Member who fails to submit his or her Proof of Claim and Release [by the bar date] shall be forever barred from receiving any payments pursuant to this Agreement.” (Settlement Agreement, ¶ 2.06(b)). Similarly, the Proof of Claim and Release warned that “THIS FORM MUST BE RECEIVED BY THE CLAIMS ADMINISTRATOR ON OR BEFORE MARCH 27, 2003. IF THIS FORM IS NOT RECEIVED ON OR BEFORE THAT DATE, THEN YOU WILL NOT RECEIVE A DISTRIBUTION.” (Proof of Claim, Section III). The procedures further provided that “[t]he Claims Administrator shall reject each Proof of Claim and Release that is from someone who is not a member of the Class, is unsigned, or is untimely.” (Settlement Agreement, ¶ 2.06(c)). Again, the Proof of Claim alerted claimants that they must submit their “completed and signed” forms by the bar date. (Proof of Claim, Section I).
 

 Once the deadline had passed, Gilardi was to make its determinations and provide a report of the results to counsel for the parties within 30 days. (Settlement Agreement, ¶ 2.06(d)). Counsel, as well as
 
 *CDLXXXVI
 
 the individual class members, were provided the opportunity to object to Gilardi’s decisions. (Settlement Agreement, ¶ 2.06(d), (f), (g)). The parties agreed that I would be the arbiter of any such objections and that my determinations would be final and conclusive. (Settlement Agreement ¶ 2.06(f), (g), (h)).
 
 [2]
 

 As it turned out, Gilardi approved some 5,166 claims for employees of Royal Caribbean, and paid out an average of $1,022.00 to these workers. It also approved 1,320 claims from Celebrity employees, with the mean award being $279.00. The total amount paid to claimants was $5,652,640.21, and the average award for all claimants was $871.00. (PI. Exhs. 4, 12 at ¶ 2). Payment was made on approved claims on November 4, 2003. (Pl.Exh. 7). Gilardi rejected claims filed by claimants who either did not work during the class period or did not work in a position covered by the settlement. More important for present purposes, Gilardi also rejected any claims filed after March 27, 2003, and any claims that were not signed. (PL Exhs. 5, 9,12 at ¶ 3).
 

 Approximately 343 claimants filed their claims late. (Hofmann Aff., ¶ 6; PI. Exh. 6). Most of these were received by Gilardi within a week or so after the bar date, and virtually all were received by July 31, 2003. (Pl.Exhs. 6, 8). Indeed, 162 of these claims were postmarked on or before March 27, 2003, but received thereafter. (Pl.Exh. 19). For example Mircea Ilie and Laura Bogdan, who are married, each signed their claim forms on March 21, 2003. The forms were postmarked in Miami on March 24, but not date stamped in Gilardi’s offices until March 28. (Affirmation of Mircea Ilie dated Dec. 3, 2003, PI. Exh. 25; Affirmation of Laura Bogdan dated Dec. 3, 2003, PI. Exh. 26). Daniel Singh received notice of the requirement to file a proof of claim on March 20, 2003, while he was working aboard a Royal Caribbean vessel. He completed the form on March 26 and posted it March 28. It was received by Gilardi on April 3. (Pl.Exhs. 17, 18). Gilardi rejected each of these claims as untimely.
 

 Some 351 claimants submitted timely proof of claim forms but failed to sign them. (Pl.Exhs. 5, 13). Gilardi did not notify these claimants that their claims were incomplete, nor did it advise class counsel of the identity of these claimants until after the deadline had passed. (Hof-mann Aff. ¶¶ 11, 14). Several claimants have explained their failure to sign the form. Raymond Franklyn indicated that it was an oversight on his part, and he noted that Gilardi had never contacted him to correct it. (Certification of Raymond Franklyn dated Nov. 26, 2003, PI. Exh. 9). John V. Welton, Bernardo Wilson, Winston Anthony Jones, and Abdurrezzak Eren all
 
 *CDLXXXVII
 
 pointed out that the front of the proof of claim form does not direct the claimant to turn the form over and sign it on the reverse side where the signature line appears. They also indicated that although they had included their addresses and telephone numbers on the form, Gilardi never contacted them to correct the deficiency. (Certification of John V. Welton dated Dec. 3, 2003, PI. Exh. 21; Certification of Bernardo Wilson dated Dec. 3, 2003, PI. Exh. 22; Certification of Winston Anthony Jones dated Dec. 3, 2003, PI. Exh. 23; Certification of Abdurrezzak Eren dated Dec. 2, 2003, PI. Exh. 24). In addition, Gilardi rejected 17 claims because they were signed not by the claimants but by an attorney who avers that he had power of attorney to execute the forms on behalf of his clients. (Affirmation of Elias B. Rud-nikas (undated), PI. Exh. 15).
 

 Class counsel now move for an order permitting the claimants who filed untimely claims to participate in the settlement, requiring Gilardi to give the claimants who failed to sign their proof of claim forms an opportunity to do so, and to deem as properly signed those forms signed by the attorney for his clients. The defendants oppose each aspect of the relief sought.
 

 Discussion
 

 A.
 
 Legal Principles
 

 At first blush, the law with respect to a court’s authority to dictate the scope of relief available in a class settlement appears ambiguous. Some courts take a strict contract approach and refuse to grant relief that deviates from the agreement of the parties.
 
 See, e.g., In re ML-Lee Acquisition Fund II, L.P.,
 
 Nos. Civ.A. 94-722-JJF, Civ.A.95-724-JJF, Civ.A.92-60-JJF, 1999 WL 184135, at *2 (D.Del. March 23, 1999);
 
 Yanda v. Vanguard Meter Service,
 
 No. 92 Civ. 2827, 1995 WL 358663, at *3 (S.D.N.Y. June 14, 1995). Others appear to apply equitable principles to expand the relief available to class members beyond that explicitly provided for in the settlement agreement.
 
 See, e.g., Zients v. LaMorte,
 
 459 F.2d 628, 630 (2d Cir.1972);
 
 In re Crazy Eddie Securities Litigation,
 
 906 F.Supp. 840, 843-44 (E.D.N.Y.1995). This apparent tension can be reconciled, however, by analyzing the circumstances under which courts follow one path or the other.
 

 In general, “[settlement agreements are contracts and must therefore be construed according to general principles of contract law.”
 
 Torres v. Walker,
 
 356 F.3d 238, 245 (2d Cir.2004) (quoting
 
 Red Ball Interior Demolition Corp. v. Palmadessa,
 
 173 F.3d 481, 484 (2d Cir.1999));
 
 see also Collins v. Harrison-Bode,
 
 303 F.3d 429, 433 (2d Cir.2002). This applies to class settlements as well as to the resolution of litigation between individual parties.
 
 See Holocaust Victim Assets Litigation,
 
 256 F.Supp.2d 150, 152 (E.D.N.Y.2003);
 
 Eardman v. Bethlehem Steel Corp.,
 
 No. 84-CV-0274E(H), 1994 WL 721386, at *4 (W.D.N.Y.1994). A settlement agree ment “represents a compromise between parties who have waived their right to litigation and, in the interest of avoiding the risk and expense of suit, having ‘give[n] up something they might have won had they proceeded with the litigation.’ ”
 
 Berger v. Heckler,
 
 771 F.2d 1556, 1568 (2d Cir.1985) (alterations in original) (quoting
 
 United States v. Armour & Co.,
 
 402 U.S. 673, 681-82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)). Accordingly, “[t]he court is not entitled to expand or contract the agreement of the parties as set forth in the consent decree.”
 
 Id.
 
 (citing
 
 Artvale, Inc. v. Rugby Fabrics Corp.,
 
 303 F.2d 283, 284 (2d Cir.1962) (per curiam)). This principle is strictly followed in class actions where the relief requested would exceed that which the parties had bargained for. As a result, courts will not permit late-filed
 
 *CDLXXXVIII
 
 claims where the consequence is to increase the obligation of the defendant.
 
 See Grace v. City of Detroit,
 
 145 F.R.D. 413, 417 (E.D.Mich.1992), For example, in
 
 ML-Lee,
 
 the court declined to extend the period during which class members would be entitled to payment for options that they tendered to the defendants. The court reasoned that even though the defendants had agreed to pay up to $14 million under the settlement agreement, any amounts not claimed would revert to them. Therefore, extension of the agreed upon deadline would be a material change in the agreement detrimental to the defendants. 1999 WL 184135, at *2.
 

 Conversely, where a change in the allocation of a settlement fund affects only the distribution among class members and not the obligations of the defendant, courts will exercise their equitable powers. In
 
 Zients,
 
 for example, the court permitted late claims because “allowing these five claims would result in only a minuscule reduction in recovery by timely plaintiffs.” 459 F.2d at 630. Similarly, in
 
 In re “Agent Orange” Product Liability Litigation,
 
 689 F.Supp. 1250, 1261-63 (E.D.N.Y.1988), the court not only allowed late claims but also permitted class members who had previously opted-out to make claims on the settlement fund. Since the settlement agreement had established a fixed or closed-end fund, there could be no prejudice to the defendants, and the plaintiffs who had filed timely claims had no justifiable expectation in any particular pay-out.
 
 Id.
 
 at 1263.
 
 In Orthopedic Bone Screw Products Liability Litigation,
 
 246 F.3d 315 (3d Cir.2001), the court allowed a late claim where all class members were asserting claims on a “finite pool of assets.”
 
 Id.
 
 at 321. The court reasoned:
 

 [W]e find it appropriate to consider the effect of [the late claimants’] inclusion on those whom it might prejudice — namely those members of the settlement class who filed their registrations by the ... deadline. It cannot be maintained that timely registrants are more deserving of remedy, for purposes of equity, than tardy registrants with similar claims, presuming the failure to register on time was indeed blameless.
 

 Id.
 
 at 324.
 

 There are also cases where courts will modify a term of a settlement agreement even where the consequence is to increase the liability of the defendants. Those cases, however, involve terms of the agreement — generally a time bar — which were established in the first instance by the court and were not subject to negotiation between the parties. In
 
 Crazy Eddie,
 
 for example, the court noted that “since the deadline for filing proofs of claim was first set by [the court] ... the instant motion is essentially a request for an enlargement of time with respect to a court ordered deadline.” 906 F.Supp. at 844. Accordingly, it found that the deadline was not “an integral part of the bargain” and could be extended in light of equitable considerations.
 
 Id.
 
 at 844-45. Similarly, in
 
 In re Cendant Corp. Prides Litigation,
 
 233 F.3d 188, 193 (3d Cir.2000), the court permitted the extension of the deadline for filing claims against a settlement fund because the defendant would not be prejudiced “since the deadline date was not agreed upon by the parties nor set by them.”
 
 See also In re Cendant Corp. Prides Litigation,
 
 311 F.3d 298, 301 (3d Cir.2002) (referencing earlier finding of absence of prejudice);
 
 In re Cendant Corp. PRIDES Litigation,
 
 235 F.3d 176, 184 n. 11 (3d Cir.2000) (same).
 

 In sum, because class settlements are contracts, courts do not generally have the authority to modify them on the basis of equitable principles alone. Courts do have the equitable power to allocate the pro
 
 *CDLXXXIX
 
 ceeds of a settlement fund among class members insofar as it does not alter the liability of the defendant. And, they can modify terms of a settlement agreement that were not the product of negotiation and compromise by the parties.
 

 Nevertheless, class counsel argue that courts may exercise broader powers of equity with respect to class settlements and should follow the standards set forth in
 
 Pioneer Investment Services Co. v. Brunswick Associates L.P.,
 
 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). In that case, the United States Supreme Court considered the standard for permitting a creditor to file a late claim in a bankruptcy proceeding.
 
 Id.
 
 at 382, 113 S.Ct. 1489. The relevant Bankruptcy Rule allowed for late filings where the original deadline had been missed as the result of “excusable neglect.”
 
 Id.
 
 at 382 n. 2, 113 S.Ct. 1489; Fed. R. Bankr.9006(b)(1). The Court held that a determination of excusable neglect is an equitable analysis requiring consideration of “all relevant circumstances surrounding the party’s omission.”
 
 Id.
 
 at 395, 113 S.Ct. 1489. These factors include (1) the danger of prejudice to the adversary, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay and whether it was within the reasonable control of the party seeking relief, and (4) whether the party seeking relief acted in good faith.
 
 Id.
 

 On its face,
 
 Pioneer
 
 is of little relevance here, since it concerned the construction of a term contained in the Federal Rules of Bankruptcy, not principles for implementing settlement agreements. Nonetheless, as class counsel point out, courts have regularly imported the
 
 Pioneer
 
 standard into determinations of whether requirements for claiming against a settlement fund should be eased.
 
 See Cendant,
 
 311 F.3d at 300;
 
 Orthopedic Bone Screw Products,
 
 246 F.3d at 321-22;
 
 Crazy Eddie,
 
 906 F.Supp. at 843-44. Those courts, however, had already made a determination that equitable factors were appropriately considered in those cases. Either because the terms at issue had not been bargained for or because the dispute did not implicate the ultimate obligations of the defendant, it was necessary to go beyond simple contract principles. In those circumstances,
 
 Pioneer
 
 provides guidance in determining the equities. But where the analysis is moored in contract principles,
 
 Pioneer
 
 does not apply.
 

 B.
 
 Late-Filed Claims
 

 Application of these principles to the late-filed claims in this case is straightforward. First, although the defendants committed to payment of up to $18.4 million into the settlement fund, they are entitled to receive back any excess that is not paid out for claims, attorneys’ fees and costs, or administrative expenses. By agreement of the parties, $5,794,016.40 has already been returned to the defendants, and another $375,585.99 has been set aside in escrow for rejected claims. (PLExh. 12, ¶¶ 7, 8). Since the Net Settlement Fund far exceeds the amount of the claims paid, allowance of late-filed claims would be a cost to the defendants.
 
 [3]
 
 Second, the bar date in this case was agreed upon by the parties, not selected by the Court. Moreover, it was specifically the subject of negotiation and compromise by counsel. (Letter of Aurora Cassirer dated July 8, 2002, attached as Exh. D to Royal Carib
 
 *CDXC
 
 bean’s Opposition to Plaintiffs’ Counsel’s Motion Regarding Untimely and Unsigned Claims (“Def.Memo.”), at 2, ¶ 5; Letter of Sanford L. Borer dated July 11, 2002, attached as Exh. E to Def. Memo., at 2, ¶ 9; Letter of Paul T. Hofmann dated July 17, 2002, attached as Exh. F to Def. Memo., at 4, ¶ 2.06(h)). Therefore, there is no justification for going beyond contract principles in determining whether late claims should be accepted here. And, “[i]t is an elementary principle of contract law that when parties bargain for a mutually-accepted date, that date has a special legal significance to the agreement.”
 
 In re New England Mutual Life Insurance Co. Sales Practices Litigation,
 
 204 F.R.D. 6, 13 (D.Mass.2001).
 

 It is no doubt true, as class counsel argue, that many of the claimants may have missed the time bar through no fault of their own. Some may not have received notice of the settlement until the deadline was upon them. Others may have had difficulty locating postal facilities or may have underestimated the time it would take for mail to be delivered. However, class counsel were well aware of such hazards during negotiations and were presumably satisfied that the deadline ultimately agreed upon took reasonable account of these concerns. The application to allow late-filed claims is therefore denied.
 

 C.
 
 Unsigned Claims
 

 The analysis with respect to unsigned claims is more subtle. As with the late-filed claims, there is no basis for invoking general principles of equity. Nonetheless the Settlement Agreement, by its terms, is governed by New York law (Settlement Agreement, ¶ 5.05), and under that law “[ijmplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.”
 
 Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,
 
 No. 03 Civ. 1537, 2003 WL 23018888, at *5 (S.D.N.Y. Dec. 22, 2003) (quoting
 
 Dalton v. Educational Testing Service,
 
 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289 (1995));
 
 see also ARI & Co. v. Regent International Corp.,
 
 273 F.Supp.2d 518, 521 (S.D.N.Y.2003). “Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party....” Restatement (Second) of Contracts § 205, cmt. a (1981).
 

 In this case, Gilardi was retained by and acted as agent for the defendants and therefore had an obligation to perform under the Settlement Agreement. That does not mean that Gilardi was required merely to refrain from violating or evading its contractual responsibilities. Rather, “bad faith ... may consist of inaction;” it can be inferred from a “lack of diligence.” Restatement (Second) of Contracts § 205, cmt. d (1981).
 

 That was the case here. Gilardi was obligated to reject any claims that were not signed. That is entirely rational. The parties did not intend that payments be made out of the settlement fund unless assured that the recipient was truly the employee he or she purported to be, as evidenced by a signature under penalty of perjury. However, when unsigned forms initially arrived, the Claims Administrator could not, in good faith, remain inert. Particularly because the signature line was on the back of the form, it was inevitable that some claimants, many of whom apparently do not speak English as a first language, would overlook it. Gilardi was therefore obligated to take reasonable steps to give these claimants the opportunity to correct the deficiency in their claims. In light of the fact that the forms included the claimant’s address and telephone number, the cost and difficulty of
 
 *CDXCI
 
 contacting them would have been minimal. In order to fulfill the purposes of the Settlement Agreement, then, claimants who submitted unsigned forms must be given the chance to cure the defect.
 
 [4]
 

 Within 30 days of the date of this Memorandum Opinion and Order, Gilardi shall mail a notice to all claimants who submitted timely but unsigned claims advising them of the need to resubmit a signed form in order to qualify for payment. A copy of the claimant’s original claim shall be enclosed so that the claimant can sign and return that form. Resubmitted forms shall be considered timely if received by Gilardi within 60 days of the date notice is sent, and the notice shall alert claimants to this deadline. Counsel may, with the Court’s approval, agree to alteration of these dates.
 
 [5]
 

 Conclusion
 

 For the reasons set forth above, the application to allow late-filed claims is denied. The application for an order providing claimants who submitted timely but unsigned claims the opportunity to submit signed claim forms is granted, and the Claims Administrator shall implement the procedures outlined above.
 

 SO ORDERED.
 

 [1]
 

 . Unless otherwise indicated, all exhibit designations refer to exhibits submitted in support of the plaintiffs' motion.
 

 [2]
 

 . The defendants suggest somewhat offhandedly that the Court lacks authority to order the relief requested in the instant motion. They argue:
 

 Nowhere does the Settlement Agreement permit Plaintiffs’ Counsel to unilaterally seek or this Court to order amendment, modification, or abrogation of any of the terms of the Settlement Agreement. Indeed, nowhere does the Settlement Agreement provide for the Plaintiffs' Counsel to take any action independent of the individual requests for review.
 

 (Royal Caribbean's Opposition to Plaintiffs’ Counsel’s Motion Regarding Untimely and Unsigned Claims ("Def.Memo.”) at 3). This argument fails for several reasons. Pursuant to the Settlement Agreement itself, the Court retains jurisdiction over its interpretation and implementation. (Settlement Agreement, ¶ 5.15). Class counsel have standing and, indeed, the obligation, to represent the class to ensure that the Settlement Agreement is properly performed. Whether the relief sought would constitute a modification of the Settlement Agreement, and whether such relief is warranted, will be discussed below.
 

 [3]
 

 . Based on the average of claims already paid out, class counsel estimate that if the rejected claims at issue here were all paid, the cost to the defendants would be approximately $605,000. (Memorandum of Law in Support of Motion at 12). That amount would be about equally divided between late-filed claims and unsigned claims.
 

 [4]
 

 . Placing this obligation on the Claims Administrator is not inconsistent with the court’s determination in
 
 Yanda.
 
 There, the court found it improper for an administrator to issue two additional and unauthorized notices to class members and then accept their claims after the agreed upon deadline for submission had passed.
 
 Yanda,
 
 1995 WL 358663, at *1. This case is distinguishable in two key respects. First, Gilardi is not being required to solicit new claims. Second, the unsigned claims here were timely, so there is no abrogation of the negotiated time bar.
 

 [5]
 

 . In light of this determination, the request for an order that the claims signed by an attorney be accepted is moot. In response to the notice of the opportunity to cure, these claimants may submit claim forms that they have signed personally, or their attorney may submit legally sufficient proof that he is exercising power of attorney on their behalf.