# State of New York
# Court of Appeals

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 22
Daler Singh, &c., et al.,
        Appellants,
    v.
City of New York, et al.,
        Respondents.

Mark C. Rifkin, for appellants.
Jesse A. Townsend, for respondents.
New York State Conference of Mayors and Municipal Officials, amicus curiae.

CANNATARO, J:

Few things are as emblematic of New York City as yellow taxicabs. Featured in countless films and television shows, the renowned yellow cab is as synonymous with New York City as Times Square or bagels. Yet despite the ubiquitous appearance of the cabs

- 1 -

on City streets, government licenses to operate taxis (called medallions) have long been difficult and expensive to obtain, in part because of the City's careful regulation of their supply and restrictions on competing forms of for-hire transportation.

Plaintiffs are entities that purchased yellow cab medallions from defendant Taxi and Limousine Commission (TLC) at a 2013 auction. As relevant to this appeal, their complaint alleges that TLC and the City breached the implied covenant of good faith and fair dealing by failing to enforce certain licensing requirements against popular smartphone applicated-based competitors like Uber Technologies, Inc. (Uber) and Lyft, Inc. (Lyft). Plaintiffs further allege that defendants engaged in deceptive business practices under General Business Law § 349 in their promotion of the auction. For the reasons that follow, we hold that plaintiffs have failed to state a claim, and therefore affirm.

I.

TLC regulates and supervises taxicabs and other for-hire vehicles in the City (*see* NY City Charter § 2303 [a]). TLC's powers include promulgating standards for the licensing of drivers and the operation of their vehicles, and developing policies both to foster innovation in the industry and to promote the comfort and convenience of consumers (*see id.* § 2303 [b]).

Among the vehicles TLC is charged with regulating are yellow taxis and "black cars." Taxis operate under a transferable license, or medallion, which is a numbered plate issued by TLC that is affixed to the outside of a taxicab (*see* 35 RCNY § 51-03; *Greater NY Taxi Assn. v State of New York*, 21 NY3d 289, 296 [2013]). Yellow taxis are the only for-hire vehicles permitted "to accept hails from passengers in the street" throughout the

entirety of the City (*see* Administrative Code of City of NY § 19-504 [a] [1]). Prior to 1996, the number of medallions was capped by the City Council at 11,787. Between 1996 and 2008, however, the City Council approved the issuance of 1,450 additional medallions, increasing the total by approximately 12% to 13,237. And in 2012, the Legislature enacted the HAIL Act, which called for TLC to issue 18,000 licenses authorizing a new class of vehicles—so-called green cabs—to accept street hails outside Manhattan's central business district (*see Greater NY Taxi Assn.*, 21 NY3d at 297-298).

In contrast, black cars are prohibited from accepting street hails. They may accept passengers only on the basis of telephone contracts or other prearrangements (*see* Administrative Code of City of NY §§ 19-502 [u], 19-507 [a] [4], 19-516 [a]). Specifically, passengers must contact a "base station," which then dispatches a black car to the requested location. The owners of black cars generally are required to have a franchise relationship with or ownership interest in the base station from which their cars accept dispatches (*id.* § 19-502 [u]; 35 RCNY 59B-03 [d] [2]). Prior to 2018, the number of black car licenses was not subject to any legal cap.

It is undisputed that the invention and proliferation of smartphones has caused major market disruption throughout the for-hire vehicle industry. Companies like Uber and Lyft allow passengers in the City and other areas to prearrange for-hire transportation through applications on their smartphones (*see Matter of Glyka Trans, LLC v. City of N.Y.*, 161 AD3d 735, 735 [2d Dept 2018] [noting the "rapid growth of for-hire vehicle services provided by companies such as Uber"]). In 2011, TLC determined that the use of smartphone apps to arrange transportation fit within its existing regulatory definition of a

prearrangement, making such vehicles black cars for regulatory purposes (*see* TLC, Industry Notice 11-15, *Attention: For-Hire Vehicle drivers receiving dispatches via smartphone apps* [July 1, 2011], https://perma.cc/V44J-JQLS; *see also Progressive Credit Union v City of NY*, 889 F3d 40, 46 [2d Cir 2018]).  As early as December 2011, TLC granted an Uber-affiliated entity a license to operate a black car base station in the City, and the complaint alleges that TLC authorized additional Uber-affiliated base stations every year between 2012 and 2015.  As a result of these and other licenses, the number of cars affiliated with app-based companies has come to exceed the number of yellow cabs in the City.  The resulting loss of market share has significantly diminished the value of taxi medallions.

In 2015, Mayor Bill de Blasio sought legislation capping black car growth from companies like Uber, but the legislation faced significant public and political opposition, including from the Governor and Comptroller.[1]  Three years later, the City Council enacted Local Law No. 147 (2018) of City of New York, which placed a one-year moratorium on new black car licenses and granted TLC authority to cap such licenses moving forward. New York thus reportedly became the first major city in the country to impose a vehicle

---

[1] Matt Flegenheimer, *De Blasio Administration Dropping Plan for Uber Cap, for Now*, NY Times (July 22, 2015), De Blasio Administration Dropping Plan for Uber Cap, for Now - The New York Times.

cap on companies like Uber.[2]   A cap on black car licenses remains in place today (*see* 35 RCNY § 59A-06 [a] [1]).

## II.

Plaintiffs purchased an aggregate of 14 wheelchair-accessible taxi medallions at a November 2013 auction held by TLC for an average winning bid of $1.34 million per medallion.[3]   Four years later, after their medallions had approximately quartered in value, plaintiffs commenced the instant action against TLC and the City.   The complaint alleges that, in advance of the auction, TLC distributed materials to bidders that misrepresented the value of yellow taxi medallions.   Plaintiffs further aver that, after the auction, TLC authorized app-based companies to operate black car base stations in the City, even though those companies "submitted no documentation that [they were] owned as a franchise or a cooperative," leading to an influx of allegedly illegal black cars that competed with plaintiffs' taxicabs and diminished the value of their medallions.   Based on these allegations, the complaint asserts causes of action against defendants for, as relevant here, violation of General Business Law § 349 and breach of the implied covenant of good faith and fair dealing.

---

[2] Emma G. Fitzsimmons, *Uber Hit With Cap as New York City Takes Lead in Crackdown*, NY Times (Aug 8, 2018), https://perma.cc/BZ4S-FUHJ.

[3] Plaintiff Daler Singh, d/b/a Gilzian Enterprise LLC, purchased an additional medallion at a February 2014 auction, but was dismissed from this action after he filed for bankruptcy.

Defendants moved pursuant to CPLR 3211 (a) (1) and (7) to dismiss the complaint. Their papers in support of the motion included auction bid forms executed by plaintiffs' principal which state, among other things:

> "I CERTIFY THAT I HAVE NOT RELIED ON ANY STATEMENTS OR REPRESENTATIONS FROM THE CITY OF NEW YORK IN DETERMINING THE AMOUNT OF MY BID. . . ."

> "I understand and agree that the City of New York has not made any representations or warranties as to the present or future value of a taxicab medallion, the operation of a taxicab as permitted thereby, or as to the present or future application or provisions of the rules of [TLC] or applicable law, other than a warranty of clear title to such medallion to successful, qualifying bidders therefore, and I acknowledge that no warranties are made, express or implied, by the City of New York, as to any matter other than warranty of clear title."

Supreme Court denied defendants' motion insofar as it sought dismissal of plaintiffs' implied covenant claim, finding unresolved issues of fact. However, the court dismissed plaintiffs' General Business Law § 349 claim based on their failure to serve a notice of claim within the 90-day period required by General Municipal Law § 50-e, which applies to claims "founded upon tort" (General Municipal Law § 50-e [1] [a]). In the alternative, the court held that plaintiffs failed to state a section 349 claim because the statute does not apply to municipal defendants and the sale of a taxi medallion is not a consumer-oriented transaction, a threshold element of the claim.

Both parties appealed, and the Appellate Division affirmed in part and reversed in part (*Singh v City of NY*, 189 AD3d 1697 [2d Dept 2020]). Plaintiffs' section 349 claim, the Appellate Division agreed, "was subject to the requirements of General Municipal Law

§ 50-e, as a cause of action sounding in fraud," and thus had properly been dismissed due to plaintiffs' failure to serve a timely notice of claim (*id.* at 1699). The Court disagreed, however, that issues of fact existed with respect to plaintiffs' implied covenant claim, holding that the claim was based on an alleged contractual promise incompatible with the disclaimers in plaintiffs' bid forms (*id.* at 1700). This Court granted leave to appeal (37 NY3d 912 [2021]). We now affirm, although on a different basis with respect to plaintiffs' section 349 claim.

III.

The first question raised on this appeal is whether plaintiffs have adequately pleaded a claim for breach of the implied covenant of good faith and fair dealing. The complaint alleges that defendants breached the covenant of good faith when, after auctioning the taxi medallions, TLC authorized app-based companies not owned as franchises or cooperatives to operate black car base stations in the City, thereby diminishing the value of plaintiffs' medallions.

It is well settled that "[i]n New York, all contracts imply a covenant of good faith and fair dealing in the course of performance" (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002]; *Kirke La Shelle Co. v Paul Armstrong Co.*, 263 NY 79, 87 [1933]). Broadly stated, the implied covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'" (*511 W. 232nd Owners Corp.*, 98 NY2d at 153, quoting *Dalton v Educational Testing Serv.*, 87 NY2d 384, 389 [1995]). However, the implied covenant "is not without limits" (*Dalton*, 87 NY2d at 389). Courts will imply an

obligation of good faith only "in aid and furtherance of other terms of the agreement of the parties" (*Murphy v Am. Home Prods. Corp.*, 58 NY2d 293, 304 [1983]; *see also Moran v Erk*, 11 NY3d 452, 456-457 [2008] [recognizing that the "'fruits' of the contract" are only those contemplated by the "plain language" thereof]). Thus, the covenant cannot be used to "imply obligations inconsistent with other terms of the contractual relationship," and encompasses only those "promises which a reasonable person in the position of the promisee would be justified in understanding were included" (*511 W. 232nd Owners Corp.*, 98 NY2d at 153 [internal quotation marks omitted]). As we have explained, "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden" to "prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is *in fact implicit* in the agreement viewed as a whole" (*Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 69 [1978] [emphasis added]).

Applying these principles here, the dispositive question is whether a reasonable person in plaintiffs' position would have understood the contracts to include a promise that TLC would enforce existing black car licensing requirements against app-based companies following the auction to protect the value of plaintiffs' investment. As the Appellate Division correctly recognized, the bid forms include disclaimers incompatible with such a promise. First, plaintiffs acknowledged in the bid forms that defendants made no representations or warranties "as to the present or future value of a taxicab medallion." As plaintiffs concede on this appeal, that language is flatly inconsistent with any suggestion that defendants guaranteed the value of their medallions.

Second, plaintiffs acknowledged in the bid forms that defendants made no representations or warranties "as to the present or future application or provisions of the rules of the [TLC] or applicable law." The plain language of that disclaimer put plaintiffs on notice that they—not defendants—bore the risk that either TLC's rules or its "application" thereof might change after the sale of the medallions. TLC's "application" of its rules encompasses its enforcement of the black car licensing requirements in place at the time of the auction. Because defendants warned plaintiffs in the bid forms that they were not guaranteeing plaintiffs' investment or making any promises about the future application of TLC's rules, plaintiffs cannot justifiably have expected that defendants were contractually committing themselves to enforce those rules for plaintiffs' benefit. Any such promise would be flatly "inconsistent with other terms of the contractual relationship" (*Murphy*, 58 NY2d at 304; *see also Moran*, 11 NY3d at 457).

Finally, it is worth noting that a reasonable person in plaintiffs' position would have been aware that the regulation of taxi medallions and black cars had been changing since 1996, most significantly in the HAIL Act passed only one year before the auction, which more than doubled the number of taxis permitted to accept hails outside Manhattan's central business district. Moreover, plaintiffs' own complaint pleads that TLC treated Uber-affiliated black cars consistently before and after the November 2013 auction. These facts further support our conclusion that the alleged promise was not reasonably inferable under the circumstances.

## IV.

Plaintiffs also appeal the dismissal of their General Business Law § 349 claim.

Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" (General Business Law § 349 [a]; *see Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v Matthew Bender & Co.*, 37 NY3d 169, 176 [2021]). We conclude that the government's issuance of a taxicab license is not a consumer-oriented transaction protected by section 349, and thus affirm the dismissal of plaintiffs' claim under the statute.[4]

As we have repeatedly stated, section 349 "is directed at wrongs against the consuming public" (*Oswego Laborers' Local 214 Pension Fund v Mar. Midland Bank, N.A.*, 85 NY2d 20, 24 [1995]). Thus, "parties claiming the benefit of the section must, at the threshold, charge conduct that is consumer oriented" (*New York Univ. v Cont. Ins. Co.*, 87 NY2d 308, 320 [1995]; *accord Carlson v Am. Intl. Group, Inc.*, 30 NY3d 288, 309 [2017]).[5] This element is satisfied only when the allegedly deceptive conduct has "a broad impact on consumers at large" (*New York Univ.*, 87 NY2d at 320). Moreover, section 349 is aimed at "modest" transactions rather than complex or unique arrangements in which "each side was knowledgeable and received expert representation and advice" (*id.* at 321 [internal quotation marks omitted]; *see Oswego*, 85 NY2d at 25).

---

[4] In light of this holding, we do not reach the issues of whether General Business Law § 349 applies to municipal defendants or whether General Municipal Law § 50-e's 90-day notice-of-claim requirement applies to a General Business Law § 349 claim.

[5] A plaintiff must also allege deceptive conduct by the defendant and injury resulting from the deception (*see Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP*, 37 NY3d at 176).

The deceptive conduct alleged in this case was directed solely at persons interested in obtaining licenses for the operation of taxicabs, not taxi consumers. Although we have recognized that professionals and business entities can qualify as "consumers" if the products or services purchased are consumer goods or their equivalent (*see e.g. Oswego* [savings accounts]; *Himmelstein* [legal resource manuals]), that is not the case here. A taxi medallion is not analogous to a consumer good or product—it is a highly-conditioned government license to operate a taxi business. The medallions not only legally authorize plaintiffs' business operations, they also subject plaintiffs to an expansive regulatory regime aimed at protecting the safety, health, comfort, and convenience of the public. In promoting and effectuating the transaction, TLC did not act as a purveyor of a consumer good, it acted within its authorized governmental function as a regulator of the for-hire vehicle industry (*cf. Kinkopf v Triborough Bridge & Tunnel Auth.*, 6 Misc 3d 73, 74 [App Term 2004] [regulatory agency's collection of bridge and tunnel tolls was part of its authorized "governmental function" and thus was "not a consumer oriented transaction . . . subject to section 349"]). Finally, this was not by any means a "modest" transaction; it was a multi-hundred-million-dollar auction and plaintiffs' principal was a sophisticated party with knowledge of and experience in the for-hire vehicle industry. For all of these reasons, we hold that plaintiffs have not pleaded the type of conduct covered by General Business Law § 349, and the claim was properly dismissed.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Order affirmed, with costs. Opinion by Judge Cannataro. Chief Judge Wilson and Judges Garcia, Singas and Troutman concur. Judges Rivera and Halligan took no part.

Decided April 27, 2023