ROHN INDUSTRIES, INC., Plaintiffs,

v.

PLATINUM EQUITY LLC, and
Pfrank, LLC, Defendants.

C.A. No. 03C–04–134 SCD.

Superior Court of Delaware,
New Castle County.

Submitted: Aug. 26, 2005.

Decided: Nov. 22, 2005.

John L. Reed, John H. Newcomer, Jr., and Matt Neiderman, Duane Morris, L.L.P., Wilmington, DE, and Maria Cilenti, and John Dellaportas, Duane Morris, L.L.P., New York City, for the plaintiffs.

Peter J. Walsh, Jr., and Sarah E. DiLuzio, Potter Anderson & Corroon, L.L.P., Wilmington, DE, and Kevin S. Reed, and Kevin Janus, Quinn Emanuel Urquhart Oliver & Hedges, L.L.P., New York City, for the defendants.

*Decision After Non–Jury Trial*
OPINION

DEL PESCO, J.

Platinum entered into a contract for the sale of assets. Defendant terminated the agreement in reliance on a provision which permitted defendant to terminate if it "*determines in good faith that there is a reasonable basis in law and in fact*" to conclude that the transaction could result in material asbestos liability. The Court's

factual finding that there was no reasonable basis in law and in fact for the termination does not result in liability for the defendant because the decision to terminate was not arbitrary or capricious, but made in good faith based on faulty legal advice.

## Facts

On November 27, 2002, Rohn and Platinum entered into an Asset Purchase Agreement (the "Agreement"), whereby Pfrank LLC (a wholly-owned entity of Platinum Equity LLC) was to acquire most of Rohn's assets, with Platinum Equity LLC serving as guarantor. For simplicity, this opinion refers to purchasers as Platinum. Platinum is in the business of buying and selling companies. It is accustomed to conducting purchases under expedited circumstances. When Platinum became interested in Rohn and commenced its due diligence, it learned that there was corporate history related to asbestos. It asked that a specific termination clause be put into the contract. Rohn agreed, as it was confident that no risk was associated with the language proffered by Platinum. The provision says:

[I]f [Platinum] *determines in good faith that there is a reasonable basis in law and in fact* to conclude that … as a result of the consummation of the [Rohn transaction, Platinum] could reasonably be anticipated to have any … material liability for any asbestos-related claim … [the contract could be terminated].[1] (emphasis supplied)

Rohn's assets were related to the manufacture of cellphone towers and associated products. None of the assets were associated with asbestos. At an earlier time, Rohn had been a division of UNR, a successor to Unarco Industries, Inc., which, prior to 1970, made products with asbestos. In 1982, as a result of asbestos liabilities, UNR filed for bankruptcy in the Northern District of Illinois (the "Bankruptcy Court"). A legal representative was appointed to represent future asbestos claimants. The plan of reorganization (the "UNR Plan") was approved by all classes, including the representative appointed to represent future asbestos claimants. On June 2, 1989, the Bankruptcy Court confirmed the UNR Plan and UNR emerged from bankruptcy.[2] UNR issued 29.4 mil-

1. Article VIII, Events of Termination, provides that the agreement may be terminated and the transaction abandoned by Buyer, "provided that Buyer or Guarantor is not in material breach of this Agreement, … (iii) on or prior to 8:00 p.m. New York time on December 11, 2002, if Buyer determines in good faith that there is a reasonable basis in law and in fact to conclude that … (B) as a result of the consummation of the transactions contemplated hereby, Buyer or any Affiliate of Buyer could reasonably be anticipated to have any … (2) material liability for any asbestos-related claim arising from any activity prior to the completion of Sellers' bankruptcy proceedings;"

Joint Trial Ex. ("JTX") 59 at 44–45, *Rohn Indus. Inc., Pfrank LLC, Platinum Equity LLC: Asset Purchase Agreement* (Nov. 27, 2002).

2. The Consolidated Plan of Reorganization dated March 14, 1989 contains the following definition:
Asbestos–Disease Claims
All alleged liabilities or obligations (under any theory of law, equity or admiralty) for death, personal injury, personal damages or punitive damages (whether physical, emotional or otherwise), whether or not included in the definition of "claim" in § 101(4) of the Code, arising out of exposure to asbestos, and arising from acts or omissions by one or more of the Debtors of the Debtors' predecessors In interest prior to the Effective Date, **regardless of when the sickness, injury or disease which gives rise to such liability or obligation, becomes or will become manifest**, Including, without limitation, all warranty, guarantee, indemnification or contribution liabilities or obligations of any of the Debtors to any other Entity to

lion shares of stock to the UNR Asbestos–Disease Claims Trust (the "UNR Trust") to discharge all asbestos claims, expressly including future claims, which were thereafter channeled to the UNR Trust.[3]

The critical components of the bankruptcy proceeding were the appointment of a representative to protect the interests of future claimants, and a specific factual finding that future claims were claims under section 101 of the Bankruptcy Code.

> the extent that such warranties, guarantees, indemnifications or contribution responsibilities to such Entity cover claims against such Entity that would, if such claims had been made directly against any of the Debtors, constitute Asbestos–Disease Claims. (emphasis supplied)

Pl. Trial Ex. ("PLX") 22 at 23, *in re UNR Indus., Inc.*, Consolidated Plan of Reorganization (Bankr.N.D.Ill. March 14, 1989).

3. The channeling injunction provides, inter alia:

[Factual findings]

\* \* \*

> F. Moreover, the Court has examined the provisions of the Plan with respect to the treatment of Asbestos–Disease Claims, including the claims of persons who have not yet manifested an asbestos-related disease ("future claimants") and has determined that the Plan makes adequate provision for those claims.
>
> \* \* \*
>
> NOW, THEREFORE, THE COURT FURTHER FINDS AS FOLLOWS;
>
> 1. In the absence of the Injunction, the reorganized Debtor, New UNR, might face limitless litigation for Asbestos–Disease Claims.
> 2. Adequate provision has been made pursuant to the Plan for the treatment of Asbestos–Disease Claims
>
> \* \* \*
>
> 5. In the absence of the Injunction, New UNR would be unable to conduct or continue in its business.
> 6. While New UNR would be irreparably harmed in absence of the Injunction, Asbestos–Disease Claimants, who would be enjoined, will have the right to pursue their claims against the UNR Asbestos–

The UNR Plan was ultimately appealed to the 7th Circuit Court of Appeals by employees whose future claims in excess of workers compensation were channeled to the UNR Trust. The 7th Circuit decision, written by Judge Easterbrook, found that "[w]hat is at stake on this appeal is nothing less than the vitality of the plan of reorganization itself."[4] The court notes that a plan of reorganization is to be disturbed only for compelling reasons.[5] The

> Disease Claims Trust established pursuant to the Plan.
>
> 7. Absent a successful reorganization, Debtors' assets would be liquidated and distributed only to existing creditors pursuant to Chapter 7 of the Bankruptcy Code. Under these circumstances, post-confirmation claimants would have rights, if any, only against corporate shells.
>
> \* \* \*
>
> 16. Due process is fully preserved. No property rights are impaired. Rather, federal law imposes a limitation or channeling of the direction for resolution of such claims, if any, as might be recognized under state law in the future. This is well within the power and rights of bankruptcy jurisdiction. (citation omitted).
>
> \* \* \*
>
> For the foregoing reasons, it is hereby ordered that:
>
> All Entities are permanently restrained and enjoined from taking any action whatsoever for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claims, Interests, Asbestos–Disease Claims . . . . against the Debtors, any Property of the Estates of the Debtors, any of the Debtors' Affiliates, New UNR, any of its property, any of its Affiliates and any of the insurance carriers or brokers in the Insurance Litigation, including, without limitation, Bituminous Casualty Corporation.

JTX 36 at 2–6, *In re UNR Indus., Inc.*, Findings of Fact, Conclusions of Law (Bankr. N.D.Ill. June 1, 1989).

4. PLX 26, *In re UNR Indus. Inc.*, 20 F.3d 766, 768 (7th Cir.1994).

5. *Id.* at 770

opinion then tackles the argument that "treating as creditors persons whose injuries from UNR's products are not yet manifest violates not only the Bankruptcy Code but also the Constitution."[6] The court concluded that the plan, which addressed the claims of future claimants, was not beyond the power of the Bankruptcy Court, nor was it unconstitutional.

> [Appellants] say that treating as "creditors" persons whose injuries from UNR's products are not yet manifest violates not only the Bankruptcy Code but also the Constitution. The constitutional claim is mysterious. Injuries attributable to past acts are certain to occur; although the identity of the victims remains to be ascertained, the existence of the injury is real enough ... The plan or reorganization provides that future claims will be satisfied out of one pile of assets (the Trust) rather than another (New UNR); apportioning claims among assets is a traditional function of bankruptcy adjudication. Principles of tort law, and of corporate reorganizations, do the same, without protest on constitutional grounds.

> \* \* \*

> As for the contention that the statute does not contemplate such a step: *11 U.S.C. § 101(5)(A)* defines as a "claim" every "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The definition is capacious, to say the least. Attaching labels such as "contingent" and "unmatured" and "disputed" to the interests of persons who will become sick in the future because of exposure to UNR's asbestos therefore does not put those interests beyond the power of the bankruptcy court.[7]

The employees sought to appeal the decision to the United States Supreme Court. Certiorari was denied.[8]

In 1994, the United States Congress considered a bill that was designed to provide certainty regarding the durability of channeling injunctions. The legislative history of the Bankruptcy Reform Act of 1994 ("1994 Act") explains that it add(s) "a new subsection (g) to section 524 of the Code, establishing a procedure for dealing in a chapter 11 reorganization proceeding with future personal injury claims against the debtor based on exposure to asbestos-containing products. The procedure involves the establishment of a trust to pay the future claims, coupled with an injunction to prevent future claimants from suing the debtor."[9] It goes on to explain that the procedure in the bill is modeled on the procedure followed when Johns–Manville filed for bankruptcy.[10] It notes that the parties in Manville developed a creative solution, through the creation of a trust to handle future claims, and an injunction "barring new asbestos claims against the emerging debtor company."[11]

The legislative history further provides:

---

6. *Id.*

7. *Id.*

8. *UNARCO Bloomington Factory Workers v. UNR Indus., Inc.*, 513 U.S. 999, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994), 63 USLW 3381 (1994) (No. 94–366).

9. JTX 61, 140 Cong. Rec. H10752–01, 68 (1994).

10. *In re Johns–Manville Corp.*, 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub. nom., Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

11. JTX 61, 140 Cong. Rec. H10752–01, 69 (1994).

The asbestos trust/injunction mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming liability. It is written, however, so that Johns–Manville and UNR, both of which have met and surpassed the standards imposed in this section, will be able to take advantage of the certainty it provides without having to reopen their cases.[12]

UNR emerged from bankruptcy in 1989 and commenced implementation on March 2, 1990. The 7th Circuit decision affirming the UNR plan was decided in April 1994. The 1994 Act was adopted in October of that year.

Beginning in 1993, the new UNR began an asset disposition strategy in order to get cash to distribute to the UNR Trust. Between 1993 and 1996 the company sold six operating divisions. The largest had a value of $90 million. In all the agreements, Rohn and UNR agreed to indemnify the purchasers for pre-purchase liabilities. No claims have ever been presented.[13] Since the creation of the UNR Trust, each time Rohn has been sued with allegations associated with asbestos, the plaintiff has been informed of the channeling injunction and the matter has ended.[14]

On July 25, 1996 the Bankruptcy Court entered a Final Decree closing the bankruptcy case in its entirety.[15]

In June or July 2002, Rohn learned that an asset sale in 2002 would generate a significant loss, which would result in a significant tax refund to the company. The concept was refined when, in late October, the company learned for the first time from its auditors that if it closed a deal by the end of December 2002, it would be able to carry losses back for five years. Otherwise, the losses could only be carried back for two years, and the refund would be much smaller. That information created an urgency to sell the remaining assets of Rohn.[16] Platinum developed an interest in purchasing Rohn in November, 2002.

Rob Barnett headed Platinum's transaction team. He and others went to Peoria to review documents in November, 2002. As part of the materials provided, Timothy W. Kirk, former vice president, general counsel and corporate secretary of Rohn, gave Barnett a copy of a 1996 memorandum that had been prepared by the law firm of Bell, Boyd & Lloyd (the "BBL legal memo"). The firm had handled the sales and dispositions of the company's assets from 1993 to 1996. The memorandum provided a historical summary of the company and of the bankruptcy litigation, including the channeling injunction and the various court rulings, as well as the 7th Circuit decision. The asset purchase agreement was signed on November 27, 2002.[17] Several assets were involved in the transaction. Included were a plant and equipment located in Peoria, Illinois, which was used for the fabrication and galvanizing of cell towers; a plant and equipment and real estate in Frankfort, Indiana that manufactured telecommunica-

---

12. *Id.*

13. Trial Tr., 57–60, afternoon December 13, 2004.

14. *Id.*, 58–59.

15. PLX 24 at 8, *UNR Indus., Inc.*, Background and Summary of UNR Bankruptcy Reorganization Proceedings (Sept. 24, 1996).

16. Trial Tr., 66–68, afternoon December 13, 2004.

17. JTX 59 at side letter, *Rohn Indus. Inc., Pfrank LLC, Platinum Equity LLC:* Asset Purchase Agreement (Nov. 27, 2002).

tion accessories such as platforms, braces, and mounting brackets to go on the towers; and a plant, equipment and real estate located in Bessemer, Alabama, where large concrete equipment enclosures were manufactured. None of the assets was related to asbestos.[18] The agreement expressly excluded claims arising from the conduct of the business prior to the closing date.[19]

As part of its due diligence effort, Platinum's attorney, Cynthia Dunnett ("Dunnett"), became aware of assurances from Rohn that no continuing asbestos liability had survived bankruptcy. Since Dunnett's firm lacked the expertise to evaluate that contention, reference was made by Platinum, through its General Counsel, Eva Kalawski, to Bennett Spiegel ("Spiegel") of Kirkland & Ellis. Spiegel was retained on November 20, 2002. Spiegel received materials including the BBL legal memo. He did not review a copy of the asset purchase agreement, although it was read to him later, prior to the decision to terminate. Spiegel was aware that the Bankruptcy Reform Act of 1994 contained a provision, Section 524(h), which attempted to grandfather certain injunctions that had been issued before the legislation was enacted, including the UNR channeling injunction. The focus of his analysis was to determine whether Rohn met the tests set forth in 11

U.S.C.A. § 524(g) and (h) to quality for the protection provided by the statute. Spiegel concluded that a reasonable argument could be made that the UNR channeling injunction was **not** grandfathered by the 1994 Act because there was no fair and equitable finding.[20]

Because of those concerns, Spiegel recommended, in early December 2002, that Platinum secure information regarding the solvency of the UNR Trust. The reports revealed that there had been a recent increase in the number of claimants, and that a moratorium on payments had been imposed. The trust did not appear to be financially sound.

By letter dated December 26, 2002, Platinum informed Rohn that it was terminating the contract.[21] The letter says, *inter alia:* "[n]otice is hereby given to the Sellers that Buyer hereby terminates the Agreement pursuant to Section 8.1(c)(iii)(B)(2) of the Agreement."[22] The decision to terminate was based on the advice of Spiegel regarding the risk of future asbestos claims.

When the Platinum transaction was terminated, a limited liability company called Fogson was created by Rohn's bank lenders. Fogson acquired the assets of Rohn to ensure payment of the $20 million tax

---

**18.** Trial Tr., 80–81, afternoon December 13, 2004.

**19.** The Asset Purchase Agreement provides:

2.4 *Excluded Liabilities.* Buyer and the Sellers agree that Buyer is not assuming any liabilities or obligations of the Sellers....

* * *

(f) unless specifically provided ..., all liabilities arising in connection with any claim, action, suit or proceeding instituted against Buyer or any of its Affiliates before, on or after the Closing Date related to the conduct of the business of the Sellers prior to the Closing Date, ...

JTX 59 at 15, *Rohn Indus. Inc., Pfrank LLC, Platinum Equity LLC:* Asset Purchase Agreement (Nov. 27, 2002).

**20.** Trial Tr., 112, morning December 20, 2004.

**21.** The contract called for termination notice to be given by December 11, 2002. By agreement, the deadline was extended to December 27, 2002.

Trial Tr., 103–106, afternoon, December 13, 2004.

**22.** JTX 25, Termination Letter from Pfrank LLC to Rohn Indus. Inc. (Dec. 26, 2002).

refund. The Fogson deal resulted in no money to the UNR Trust or to the other shareholders.[23]

## Applicable Standard

Section 10.7 of the Purchase Agreement provides that New York law governs. New York law provides that the plaintiff in a breach of contract suit bears the initial burden of showing that a valid contract existed and that the defendant terminated the agreement. The burden then shifts to the defendant to prove that it had good cause to terminate.[24] The same standard exists for breach of guaranty.[25] The existence of a valid contract is not contested. The issue presented in this case is whether Platinum properly terminated under Section 8.1(c)(iii)(B)(2). Platinum bears that burden of proof.

■ I ruled on summary judgment that Section 8.1 imposes an objective standard for determining what constitutes a *reasonable basis in law and in fact.* That ruling is based on New York law. Under New York law, a *reasonable basis in law and in fact* is a legal position that is "substantially justified."[26] Substantially justified means "more than merely undeserving of sanctions for frivolousness."[27] Such a position must be "justified to a degree that could satisfy a reasonable person."[28]

■ I also applied an objective standard to a determination of whether the decision to terminate the contract was determined in good faith. Good faith requires that a decision not be made arbitrarily or irrationally.[29]

## Section 524 (g) and (h)

Spiegel understood his engagement with Platinum to be to determine whether Platinum could rely on the channeling injunction to protect it from future claimants.[30] Since Spiegel concerned himself only with the effect of the 1994 Act, the discussion will begin there.

■ The parts of the 1994 Act offered by Rohn as comfort to Platinum were §§ 524(g) and (h). Subsection (g) provides that a court entering "an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction ... to supplement the injunctive effect of a discharge under this section."[31] The subsection expressly authorizes a channeling injunction with respect to any claim that is to be paid "in whole or in part by a trust...."[32] It limits further proceedings involving the injunction to the district court in which such injunction was entered and it expressly protects transferees of any assets.[33]

**23.** Trial Tr., 89, afternoon December 13, 2004.

**24.** *Stainless Corp. v. Middlesex (U.S.A.) Inc.,* 284 A.D.2d 151, 151, 726 N.Y.S.2d 419 (2001).

**25.** *Kensington House Co. v. Oram,* 293 A.D.2d 304, 305, 739 N.Y.S.2d 572 (2002).

**26.** *Perez v. New York State Dept. of Labor,* 259 A.D.2d 161, 163, 697 N.Y.S.2d 718 (1999) (citing *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

**27.** *Pierce,* 487 U.S. at 566, 108 S.Ct. 2541.

**28.** *Perez,* 259 A.D.2d at 163, 697 N.Y.S.2d 718.

**29.** *Dalton v. Educational Testing Service,* 87 N.Y.2d 384, 392, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995).

**30.** Trial Tr., 5, afternoon December 20, 2004

**31.** JTX 62, 11 U.S.C.A. § 524(g)(1)(A) (1994).

**32.** *Id.* § 524(g)(1)(B).

**33.** *Id.* § 524(g)(3)(A)(ii).

Subsection 524(h) is the grandfathering provision. It permits the benefits provided in subsection (g) to apply to channeling injunctions issued before the date of the enactment of the 1994 Act if various conditions are met. The only condition in dispute in this case requires that:

> (A) the court determined at the time the plan was confirmed that the plan was fair and equitable **in accordance with the requirements of section 1129(b)**.[34] (emphasis supplied)

Section 1129(a) provides the various requirements that must be met in order for a court to confirm a plan. Subpart (a)(8) requires that with respect to each class of claims or interests, the class must accept the plan or not be impaired by the plan. Subpart 1129(b) provides that if all the requirements of (a) are met except (8)—in other words, if it is a contested plan—then the court "shall confirm the plan notwithstanding the requirements of such paragraph [(8)] if the plan does not discriminate unfairly, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under or has not accepted, the plan." [35] (emphasis supplied)

Section 1129(b) is invoked only if a plan fails to satisfy § 1129(a)(8). That subsection is satisfied when all classes accept a plan, as was the case with the UNR plan. Consequently, the Bankruptcy Court was not called upon to make a *fair and equitable* finding.

With the 1996 BBL legal memo and associated documentation in hand,[36] Spiegel requested research be conducted by an associate in his firm (the "K & E Memo").[37] The time records indicate that she spent 3.9 hours on the project, 1.3 doing research, and 2.6 writing the only memorandum ever prepared.[38] The memorandum says that no express *fair and equitable* finding was made by the bankruptcy court, and notes that "[w]e are without key facts to ascertain whether the injunction is still valid to an absolute certainty." It concludes with the following:

> Moreover, section 524(h) does not affirmatively state that an injunction that was issued in connection with a plan that does not meet the requirements of section 524(h) is necessarily invalid. The UNR plan was also confirmed by the Seventh Circuit Court of appeals [sic], although the issue of the validity of the asbestos injunction was not discussed. *In the Matter of UNR Industries, Inc.*, 20 F.3d 766 (7th Cir.1994).[39]

---

**34.** *Id.* § 524(h)(1)(A).

**35.** 11 U.S.C.A. § 1129 (1994).

**36.** JTX 13, *UNR Indus., Inc.*, Background and Summary of UNR Bankruptcy, Reorganization Proceedings (Sept. 24, 1996); *In re UNR Indus., Inc.*, Findings of Fact, Conclusions of Law (Bankr.N.D.Ill. June 1, 1989); *In re UNR Indus., Inc.*, Confirmation Order (Bankr. N.D.Ill. June 1, 1989); *In re UNR Indus., Inc.*, Consolidated Plan of Reorganization (Bankr. N.D.Ill. March 14, 1989); Letter from Timothy W. Kirk, Rohn Industries, Inc., to Jerry H. Summers (Sept. 8, 2000); Letter from Jerry H. Summers, Summers & Wyatt, P.C., to Timothy W. Kirk (Sept. 19, 2000); *Brown v. T & N PLC, et al.*, Notice of Nonsuit as to UNR Industries, Inc. (Sept. 19, 2000).

**37.** The memorandum stated the issue differently. It said, "The issue is whether the injunction entered into in connection with UNR debtor plan of re-organization in 1989 is still valid under the law. We are without key facts to ascertain whether the injunction is still valid to an absolute certainty."

JTX 6, Memorandum from Kirkland & Ellis to Platinum Equity Holding (Dec. 7, 2002).

**38.** DFX 86, Legal Services Invoice from Kirkland & Ellis to Platinum Equity LLC (Dec. 27, 2002).

**39.** JTX 6, Memorandum from Kirkland & Ellis to Platinum Equity Holding (Dec. 7, 2002).

The problem identified by the memorandum, the absence of a 524(h) *fair and equitable* finding, became the focus of Spiegel's review because without 524(h) protection he perceived there to be three specific risks. First, the risk that future claimants would not be bound by the channeling injunction to look to the UNR Trust for compensation. Second, that liability could follow the assets since the text of the channeling injunction did not expressly enjoin an action against a transferee of assets.[40] Third, the channeling injunction was not final; it could be modified later. He advised Platinum that without 524(h) protection, plaintiffs could go into courtrooms, anywhere in the country, and ignore the injunction. He further advised that the injunction would provide no protection for the asset purchaser. He reasoned that so long as the UNR Trust had money, it would not be a problem, but if the trust were imperiled, a state court judge might decide that there would be a right to proceed against the successor.[41]

The legal conclusion that 524(h) may not protect Platinum drove Spiegel's recommendation that Platinum look at the solvency of the UNR Trust.

The plaintiff's expert, Professor Adler, expressed the opinion that a *fair and equitable* finding was not necessary for UNR to qualify for the protection of (g). He explained:

> 524(h)(1)(A) says that for a Channeling Injunction to [qualify for] . . . .the safe harbor, . . . the plan confirmed must include a finding that the plan was fair and equitable in accordance with the requirements of 1129(b).
>
> 1129(b) is a provision of the Bankruptcy Code that applies only when a class of claims descends from a reorganization plan.
>
> Putting this together with the 524(h)(1)(A), you get the following. That is, if a plan of reorganization involves a class of claims that objected to the plan, but that the plan was approved over that objection, the Court would have had to find that the plan was fair and equitable in order for that plan to satisfy 1129(b) and thus to satisfy 524(h)(1)(A).
>
> The thing about 1129(b) though, is that it doesn't apply at all if section 1129(a)(8) of the . . . Bankruptcy Code is satisfied.
>
> And 1129(a)(8) is a provision that says if there's an objecting class of claims or interests, then the plan must satisfy 1129(b), which in turn suggests that the plan must be found fair and equitable.
>
> In the UNR case, there was no objecting class of claims or interests, therefore, there was no requirement of fair and equitable under 1129(b) and it's simply literally true under 524(h)(1)(A) that the UNR plan did satisfy the requirement that the Court find the plan fair and equitable in accordance with section 1129(b). [sic] Because Section 1129(b) did not require a fair and equitable finding, then 524(h)(1)(A) didn't require one either.

---

**40.** The channeling injunction orders that:

All Entities are permanently restrained and enjoined from taking any action whatsoever for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claims, Interests, Asbestos–Disease Claims or Asbestos–Property Claims . . . against the Debtors, any Property of the Estates of the Debtors, any of the Debtors' Affiliates, New UNR, any of its property, any of its Affiliates and any of the insurance carriers. . . .

JTX 36 at 6, *In re UNR Indus., Inc.*, Findings of Fact, Conclusions of Law (Bankr.N.D.Ill. June 1, 1989).

**41.** Trial Tr., 121–125, morning December 20, 2004.

So in accordance with 1129(b), a fair and equitable finding was made.[42]

Adler also points out that it would be illogical for a contested plan, a cram-down plan, to be eligible for the grandfathering protection of 524(h), but not for a consensual plan to be eligible.[43] In order to achieve his interpretation of the statute, Adler argues that the words **in accordance with the requirements of section 1129(b)**[44] should be interpreted to mean, "as required by section 1129(b)."[45] With such an interpretation, a case such as UNR would not require a *fair and equitable finding*.

Rohn makes the alternate argument that an 1129(b) finding was made. The confirmation order says: "[t]he other requirements of Section 1129 have not been put in issue to the extent that the debtor has a burden to establish those requirements, the court determines that burden has been met."[46] The finding is a routine statement made years before the adoption of the 1994 Act. It is part of a general recitation associated with a plan approval. The other channeling injunction to be protected by the 1994 Act was in the Johns–Manville case. In that case, because it was a cram-down plan, the fair and equitable finding was expressly made.

The defendants called Professor Elizabeth Warren as an expert witness to respond to Adler, and to buttress the opinion of Spiegel.

Warren testified that the UNR channeling injunction does not qualify for the grandfathering protection provided by Section 524(h) because the Bankruptcy Court judge did not find that the plan was *fair and equitable*.[47] She, like Adler, explained that the finding was not required because the UNR Plan was a consensual plan, so it fell under 1129(a). Since the clear language of 514(h) requires a *fair and equitable* determination and there was none, because none was required, the grandfathering provision is not available to Rohn.[48] She reaches that conclusion notwithstanding the legislative history that indicates that both Johns Manville and UNR were intended to be the beneficiaries of the statute.[49] In so doing, she relies on a principle of statutory interpretation: legislative intent is considered only when the

---

42. Trial Tr., 98–100, morning December 14, 2004.

43. Professor Adler explained, "There is no reason I can even imagine, based on the structure of the way the Bankruptcy Code is designed, to permit a special protection for controversial plans or ones that are passed over dissent and not afford the same protection for plans such as that in UNR where there is no dissenting class."
Trial Tr., 5, afternoon December 14, 2004.

44. 11 U.S.C.A. § 524(h)(1)(A).

45. Trial Tr., 43–45, 58, afternoon, December 14, 2004.

46. JTX 17, UNR Indus., Inc.: Confirmation Hearing, Plan of Reorganization, 7th Cir. (Judge David H. Coar).

47. Trial Tr., 52–55, December 17, 2004.

48. *Id.*, 46–49.

49. Chapter 524[4] of Collier on Bankruptcy summarizes the effect of the 1994 Statute:

    The statute and legislative history make clear that the provisions of section 524(g) are to apply to cases in which there already existed an injunction that met the requirements set forth in that section. In particular, the legislative history mentions two cases, those of the Johns–Manville and UNR corporations. (Citation to the Congressional Record omitted.)
    *Collier on Bankruptcy*, P524.07 (15th Ed. Revised).

language of the statute is ambiguous.[50] Since she concludes that the statute is not ambiguous, she opines that the legislative intent would not be reached. To buttress her position, she cites *Lamie v. United States Trustee* as an example of The Supreme Court's rigid adherence to the clear language of a statute, even when the desired result of the statute was not achieved.[51]

The argument that the absence of a *fair and equitable* finding defeats the protection provided by the statute would produce an absurd result. It would protect a cram down plan but not a consensual one. In such a circumstance, the text must be treated as ambiguous. When a statute is ambiguous, it is appropriate to look at the legislative history.[52] The legislative history could not be more clearly stated.

The case of *Lamie v. United States Trustee* is readily distinguishable. It considers entitlement to attorneys fees under the 1994 Act. The Supreme Court considered the case because Courts of Appeals were split on the issue.[53] The Court of Appeals decision under review had based its decision on the plain meaning of the statute "particularly because application of that plain language supports a reasonable interpretation of the Bankruptcy Code[.]" [54]

Warren's interpretation does not support a reasonable interpretation of the Bankruptcy Code.

The 1994 Act was enacted to provide comfort. The comfort was necessary to enable companies driven to bankruptcy by asbestos claims to emerge from bankruptcy and to engage in business transactions without the encumbrance of future claims. The statute addressed a number of important issues promptly, thus obviating the need to wait for a body of law to develop regarding the durability of channeling injunctions. But Spiegel was not looking at this transaction in 1994, he was looking at it in 2002.

Spiegel testified that if the grandfathering provisions of the 1994 Act failed to cover the UNR injunction, the areas of concern were future claimants who were not enjoined by a channeling injunction, the liability of a transferee or successor of an asset, and the finality of the injunction.

If Spiegel had been opining about the Rohn transaction at the time the statute was under consideration, his focus solely on the protection afforded by the statute would have been appropriate. However, a substantial body of law had developed by 2002, including, **significantly,** a final decision in the UNR case-the Easterbrook decision that Spiegel did not read. Those subsequent decisions addressed the areas of concern and provided a separate basis for comfort in the transaction.

## Channeling Injunctions for Future Claimants

The K & E memo red flags the fact that there is nothing in the 1994 Act that would operate to *invalidate* an existing permanent channeling injunction. In other

---

**50.** Trial Tr., 59–60, December 17, 2004.

**51.** *Lamie v. United States Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).

**52.** *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S.

235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))).

**53.** *Lamie*, 540 U.S. at 533, 124 S.Ct. 1023.

**54.** *In re Equipment Services, Inc.*, 290 F.3d 739, 745 (C.A.4 2002).

words, even if the 1994 Act did not protect UNR, it did not imperil it either. Yet, Spiegel did not do (or request) any research to determine whether channeling injunctions had been upheld in the interim years.[55] Such an inquiry would have revealed that they have uniformly been upheld.[56]

The K & E Memo also misinformed Spiegel that the 7th Circuit had confirmed the UNR plan "although the issue of the validity of the asbestos injunction was not discussed."[57] That statement is simply incorrect. The 7th Circuit decision addressed head-on, the arguments advanced by the appellants that the channeling injunction was unconstitutional and that it exceeded the authority of the Bankruptcy Court. Judge Easterbrook made short work of both arguments:

> [Appellants] say that treating as "creditors" persons whose injuries from UNR's products are not yet manifest violates not only the Bankruptcy Code but also the Constitution. The constitutional claim is mysterious. Injuries attributable to past acts are certain to occur; although the identity of the victims remains to be ascertained, the existence of the injury is real enough....
> The plan of reorganization provides that future claims will be satisfied out of one pile of assets (the Trust) rather than another (New UNR); apportioning claims among assets is a traditional function of bankruptcy adjudication. Principles of tort law, and of corporate reorganizations, do the same, without protest on constitutional grounds ...
>
> As for the contention that the statute does not contemplate such a step: 11 U.S.C. § 101(5)(A) defines as a "claim" every "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The definition is capacious, to say the least. Attaching labels such as "contingent" and "unmatured" and "disputed" to the interests of persons who will become sick in the future because of exposure to UNR's asbestos therefore does not put those interests beyond the power of the bankruptcy court.[58]

Once the United States Supreme Court denied *certiorari,* the case was returned to the Bankruptcy Court, which implemented the plan and entered a Final Decree in 1996.

### Successor Liability

The 1994 Act provides:

> "[N]o entity that ... becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor, ..."[59]

The UNR Channeling injunction provides:

**55.** Trial Tr., 53–54, afternoon December 20, 2004.

**56.** *In re Celotex Corp.,* 204 B.R. 586, 609 (Bankr.M.D.Fla.1996); *In re Joint E. & S. Dists. Asbestos Litig.,* 878 F.Supp. 473, 565 (E.D.N.Y.1995), *aff'd in relevant part,* 1996 U.S.App. Lexis 2894 (2d Cir.N.Y.1996); *In re A.H. Robins Co.,* 88 B.R. 742, 744–54 (E.D.Va.1988), *aff'd,* 880 F.2d 694 (4th Cir. 1989); *In re Johns–Manville Corp.,* 68 B.R. 618, 626 (Bankr.S.D.N.Y.1986), *aff'd* sub. nom., *Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988).

**57.** JTX 6, Memorandum from Kirkland & Ellis to Platinum Equity Holding (Dec. 7, 2002).

**58.** *In re UNR Indus.,* 20 F.3d at 770.

**59.** 11 U.S.C.A. § 524(g)(3)(A)(ii).

All Entities are permanently restrained and enjoined from taking any action whatsoever for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claims, Interests, Asbestos–Disease Claims or Asbestos–Property Claims ... against the Debtors, any Property of the Estates of the Debtors, any of the Debtors' Affiliates, New UNR, **any of its property,** any of its Affiliates and any of the insurance carriers or brokers in the Insurance Litigation ... [60] (emphasis supplied)

▆▆▆▆ Spiegel did not conduct research regarding successor liability.[61] Had he done so, he would have found comfort in the case law. It is a well-settled rule of corporate law that "where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor." [62] "Four generally recognized exceptions qualify this principle of successor nonliability. The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company." [63]

This was an arms-length sale of assets. There is no contention that any of the exceptions listed above is relevant in this case. The purchaser was not assuming liability, it was not a consolidation or merger, it was not fraudulent or intended to provide an escape from liability, and the purchasing corporation was not a mere continuation of the selling company. Rohn would exist after the transaction. Assets, which had never been associated with asbestos, were being transferred. Plain and simple. There was no legitimate basis for Platinum to be concerned about successor liability. Platinum does not argue otherwise in its post-trial papers.

### Finality

Spiegel was concerned that without the protection of Section 542(g), the injunction could be modified or revoked by another court in another jurisdiction.

▆▆▆▆ "The doctrine *of res judicata* 'is not a mere matter of technical practice or procedure' but 'a rule of fundamental and substantial justice.'" [64] *Res judicata* "requires a showing that there has been (1) a final judgment on the merits in a prior [law]suit involving (2) the same claim and (3) the same parties or their privies." [65] *Res judicata* applies to bankruptcy confir-

**60.** JTX 36 at 6, *In re UNR Indus., Inc.,* Findings of Fact, Conclusions of Law (Bankr. N.D.Ill. June 1, 1989).

**61.** Trial Tr., 55–56, afternoon December 20, 2004.

**62.** *Polius v. Clark Equipment Co.,* 802 F.2d 75, 77 (3d Cir.1986) (citing 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* § 7122 (Perm. Ed. 1983)).

**63.** *Id.* at 78 (citing *Philadelphia Elec. Co. v. Hercules Inc.,* 762 F.2d 303, 308–309 (3d Cir. 1985); *Knapp v. North American Rockwell Corp.,* 506 F.2d 361, 363–364 (3d Cir.1974)).

**64.** *Burke v. Timothy's Restaurant,* 2005 WL 1801684 (D.Del.) (citing *Equal Employment Opportunity Commission v. U.S. Steel Corp.,* 921 F.2d 489, 492 (3d Cir.1990) (quoting *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148 (1917))).

**65.** *Id.* (quoting *U.S. Steel Corp.,* 921 F.2d at 493 (citing *United States v. Athlone Indus., Inc.,* 746 F.2d 977, 983 (3d.Cir.1984))). See also *Rodriguez v. Abbott Laboratories,* 151 F.R.D. 529, 532 (S.D.N.Y.1993) (citing *Multi–State Communications, Inc. v. United States,* 648 F.Supp. 1203, 1206 (S.D.N.Y.1986)).

mation orders.[66]

■ As to the first element, when the United States Supreme Court denied *certiorari,* all challenges to the 7th Circuit decision ended. It was final. As to the second and third elements, the 7th Circuit decided that future claims were claims within Section 101(5) of the Bankruptcy Code, thereby making any future claimant a party; and it affirmed the plan with the channeling injunction as a principal component. All future claimants must look to the UNR Trust for compensation.

I find that there was no reasonable basis in law or in fact for the termination of the agreement. The 1994 Act was an added layer of protection that was thought to be needed at the time it was enacted. Even if the theoretical concerns about the application of the 1994 Act were legitimate, that did not excuse Spiegel's failure to look at the body of law affirming the use of channeling injunctions. The short work made of this task speaks the loudest. The matter was not given appropriate consideration. I have not overlooked the testimony of Dr. Rabinowitz about the surge of asbestos filing in the early 2000's. That surge of activity does not change the law, and the law provided exceptional protection to Platinum. The discussion does not end here, as the defendant argues that it relied on the advice of counsel in rejecting the transaction, and did so in good faith.

### Good Faith

The termination provision requires that if Platinum *determines in good faith that there is a reasonable basis in law and in fact* to conclude that it was at risk of *material liability for any asbestos-related claim* as a result of the consummation of the deal, it could terminate the contract. That contract language was specifically added to accommodate Platinum when the parties desired to enter into a contract, but Platinum had not yet completed its due diligence on the asbestos-related issues.

The provision confers discretion on Platinum to terminate the agreement so long as it behaved in good faith. Good faith has been construed in New York to be a promise "not to act arbitrarily or irrationally in exercising that discretion." [67]

Platinum argued in its cross-motion for summary that "[s]ettled New York law provides that Platinum's exercise of its discretion under the Asbestos Termination Provision is not reviewable in court, save for good faith." [68] I agree. The issue is whether Platinum acted in good faith.

Platinum further argues that it relied on the advice of informed counsel. The defendant has the burden of proving that its breach of the contract was justified; that it acted in conformance with the termination provision. Reliance on advice of counsel is an argument usually used defensively, to *negate* an element of a particular crime or tort, such as fraudulent intent.[69]

■ There are no factual disputes about what happened during the last six weeks of 2002. Platinum called on a number of experts to assist in evaluating the Rohn transaction. It hired PricewaterhouseCoopers to analyze pension and employee benefit matters, Project Navigator to analyze environmental issues, Dunnett from Riordan & McKinsey to handle the

---

**66.** *Donaldson v. Bernstein,* 104 F.3d 547, 554 (3d Cir.1997).

**67.** *Dalton v. Educational Testing Service,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995).

**68.** Def. Ans. Br. at 14.

**69.** Gregory E. Maggs, *Consumer Bankruptcy Fraud and the "Reliance of Counsel" Argument,* Am.Bankr.L.J., 10 (1995).

transactional matters, and Spiegel of Kirkland & Ellis to advise on asbestos. Spiegel is a bankruptcy partner in Kirkland & Ellis who had handled twenty engagements for Platinum. Since the deal was signed in late November and required closing before the year-end, there was little time available to complete the due diligence. Dunnett and Matt Young, who were managing the Rohn transaction for Platinum, received an opinion from Spiegel orally, then in a report dated December 5, 2002, raising the question of the *fair and equitable* finding, and suggesting that further information be developed about the solvency of the UNR Trust. Dunnett testified that she had no background in bankruptcy matters.[70] When information about the financial condition of the UNR Trust was received, it appeared bleak to Dunnett and Young. The Trust report revealed that a moratorium of payments was in place, that there was an increase in the number of claims, and that Rohn's financial circumstances had led to a drop in the value of the assets of the UNR Trust.[71]

Dunnett described the various communications that took place during late December including several conferences with Platinum parties and counsel at Fried Frank who were representing Rohn. Spiegel participated in the discussions, and he was unwavering in his opinion that the channeling injunction would not provide the protection represented to by Rohn to be available.

Dunnett testified that Platinum relied "solely on the advice of Bennett Spiegel with respect to bankruptcy issues."[72] Neither she nor any other attorney at her firm did an independent investigation of the bankruptcy issues delegated to Spiegel.[73] Dunnett testified that "[t]he decision to terminate was made based on the standard relating to the bankruptcy asbestos issue."[74]

Eva Kalawski was the individual at Platinum who made the decision to terminate the Rohn agreement on the basis of the asbestos termination provision.[75] She testified that the decision was based on her various conversations with individuals, including Spiegel, who raised questions about Rohn's representation that there was no asbestos liability to be concerned about.[76]

There is nothing in the handling of the due diligence activities by Platinum which suggest to me that there was any reason other than concern about asbestos liability, which formed the basis for their decision to terminate the agreement.

I find that Platinum's decision, made by Kalawski with the concurrence of others, including Dunnett, was made in good faith. Analysis of asbestos liability requires expertise. Platinum acted appropriately in seeking counsel who appeared to have that expertise, and providing him with the best available information. The legal advice that was provided to Platinum, though objectively unreasonable, caused Platinum to doubt the application of the 1994 Act to the Rohn channeling injunction and to attach unwarranted significance to the financial status of the UNR Trust. That advice, and the insistence of Spiegel that without the protection of the 1994 Act there was a risk of successor liability, gave Platinum a basis in law to terminate the agreement.

70. Trial Tr., 101, morning December 16, 2004.

71. Trial Tr., 4–5, afternoon December 16, 2004.

72. *Id.*, 70–71.

73. *Id.*, 74.

74. *Id.*, 77.

75. Kalawski Dep. 66, Dec. 27, 2004.

76. *Id.*, 27, 66.

Platinum's focus was misdirected by Spiegel to the solvency of the UNR Trust. When it was discovered that the UNR Trust had a moratorium in place, and that its financial condition appeared precarious, Platinum had a basis in fact for the decision to terminate the agreement.

Judgment is entered in favor of the defendant.

## ORDER

For the reason set forth in this Court's Memorandum Opinion of November 22, 2005, judgment is hereby entered in favor of the defendant.

IT IS SO ORDERED.

